## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Humane Society of New York<br>306 E 59th St.<br>New York, NY 10022 | |
| Dentists for America, LLC<br>8 The Green #11433<br>Dover, DE 19901 | Civil Action No. |
| Physicians for American Healthcare<br>Access<br>P.O. Box 1895<br>Dover, DE 19903; | **COMPLAINT** |
| Hodges Bonded Warehouse, Inc.<br>1065 N. Eastern Blvd.<br>Montgomery, AL 36117 | |
| Information Technology Industry<br>Council<br>700 K St NW, Suite 600<br>Washington, D.C. 20001, USA | |
| Plaintiffs,<br>   v. | |
| Alejandro Mayorkas, in his official<br>capacity as<br>Secretary of Homeland Security,<br>20 Massachusetts Avenue, NW<br>Washington, DC 20529-2120 | |
| Department of Homeland Security<br>20 Massachusetts Avenue, NW<br>Washington, DC 20529-2120 | |
| United States Citizenship and<br>Immigration Services<br>20 Massachusetts Avenue, NW<br>Washington, DC 20529 | |
| Defendants. | |

# I.     INTRODUCTION

1.      On January 8, 2021, Mr. Chad Wolf, who purported to serve as the Acting Secretary of the Department of Homeland Security ("DHS") published a final rule, *Modification of Registration Requirement for Petitioners Seeking To File Cap-Subject H-1B Petitions*, 86 Fed. Reg. 1676 (Jan. 8, 2021) ("rule" or "final rule").

2.      This final rule unlawfully makes the H-1B nonimmigrant visa selection process dependent on wage level and unlawfully gives priority for lottery selection to those H-1B applicants who are paid the highest wages. This rule will foreclose eligible H-1B workers who are not paid at the highest wage levels, including Plaintiffs in this matter.

3.      In 2019, however, prior to the issuance of this final rule, Defendants concluded that they lacked the authority to promulgate such a rule changing the H-1B visa selection process, correctly stating that to prioritize H-1B visa "selection on other factors, such as salary, would require statutory changes." *Registration Requirement for Petitioners Seeking to File H-1B Petitions on Behalf of Cap-Subject Aliens*, 84 Fed. Reg. 888, 914 (Jan. 31, 2019).

4.      Defendants inexplicable change in position and issuance of the unlawful final rule will drastically alter the way that H-1B applicants are selected in the lottery.  It will have a deleterious impact on small business, start-ups, non-profits, rurally located business and other industries that rely on foreign highly skilled workers, but who are not able to compensate workers at the highest wage level.

5.      The final rule  contravenes the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1184(g)(3), by amending regulations governing the process by which USCIS selects H-1B registrations for the filing of H-1B cap-subject petitions by first selecting registrations for employers who pay the highest wages based on the highest Occupational Employment Statistics

(OES) wage levels and indicating that the proffered wage equals or exceeds the average wage for the relevant Standard Occupational Classification (SOC) code and area(s) of intended employment.   The INA dictates the selection   process of   H-1B applicants, providing that: "[A]liens who are subject to the numerical limitations of paragraph (1) shall be issued visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas or status." 8 U.S.C. § 1184(g)(3).   This statutory violation by the new regulation is clear and unmistakable, as Defendants themselves have previously recognized.

6.     Mr. Wolf, who purported to serve as the Acting Secretary of Homeland Security and who "reviewed and approved" the final rule, delegated "the authority to electronically sign this document to Ian J. Brekke, who is the Senior Official Performing the Duties of the General Counsel for DHS."  86 Fed. Reg. at 1731.

7.     Neither individual was properly appointed and had the legal and valid authority to promulgate the final rule.

8.     The H-1B Selection Final Rule was originally scheduled to go into effect on March 9, 2021. *Modification of Registration Requirement for Petitioners Seeking To File Cap-Subject H-1B Petitions; Delay of Effective Date*, 86 Fed. Reg. 8543, 8544 (Feb. 8, 2021).

9.      USCIS subsequently "determined that the final rule's 60-day effective date does not afford USCIS sufficient time between the publication of the rule on January 8, 2021, and March 9, 2021, to complete the development and thoroughly test the modifications needed in the H-1B registration system to sufficiently minimize technical risks that result from a compressed testing schedule, as well as to amend policies and train staff to ensure the effective and orderly administration of the cap under the H-1B Selection Final Rule."  *Id.*

10.     USCIS published notice that it would delay "the H-1B Selection Final Rule until December 31, 2021 and is applying the regulations currently in place (random selection) to the initial registration period, and, most likely, any subsequent registration period for the FY 2022 registration process." *Id.*

11.     As discussed herein, the rule is not in accordance with law and should be set aside in its entirety prior to ever becoming effective because of the substantive flaws and promulgation by officers holding no lawful authority.

## II.      JURISDICTION AND VENUE

12.     This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et. seq.* The Court has subject matter jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction). This Court has authority to grant relief under the Declaratory Judgment Act (28 U.S.C. § 2201) and the APA, 5 U.S.C. § 702.

13.     Venue in this judicial district is proper under 28 U.S.C. § 1391(e) because this is a civil action in which defendants are agencies of the United States and federal officers acting in their official capacity, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.      THE PARTIES

**PLAINTIFFS:**

14.     Plaintiff **Humane Society of New York** has been caring for homeless, injured, and ill animals for over 100 years in New York City, New York.  Since opening in 1904, the Humane Society of New York has expanded from its initial purpose of fighting abuse against the city's horses, to now including a full-service veterinary hospital, enabling dog and cat pet owners with limited means to receive quality treatment for their pets at affordable rates.  The Humane Society

4

of New York has had to utilize the H-1B program because they have had to hire highly specialized people in various fields with the education and technical skills needed to perform the duties of their positions.  But, as the mission of the organization is to serve people and pets with limited means, the HSNY is not always in a position to take top-of-the-market wages, and having to comply with this rule would end up hurting the people and animals the organization is meant to serve.  The Humane Society will need to divert resources from other critical areas in its budget, charge more to the impoverished, or make do without the needed employees.

15.     Plaintiff **Dentists for America, LLC** is a Delaware-based, non-profit membership organization.  Dentists for America is comprised of international dentists primarily from India who have received their education and training in the United States, and who advocate for better, fairer immigration laws and policies affecting their members and the broader international dental community in the United States.  International dentists are foreign-trained dentists who have been educated abroad and then enter the U.S. for a rigorous additional two to three years of education in a DMD/DDS program.  Only 32 universities in the country offer such programs, slots are very limited, and the entry process is extremely competitive.  International dentists typically work in rural, underserved areas where most American dentists are hesitant to work, there are already severe shortages of dentists, and payment of higher H-1B salaries, as this new wage-based selection system would force, are simply not possible.  In addition, a large number of international dentists work in universities across the United States, actively teaching and training dental students.  If unable to hire international dentists due to their inability to be selected for H-1B visas, these universities will not have the instructors they need to train the U.S.-born dentists who are needed in the workforce.

16.     Plaintiff **Physicians for American Healthcare Access** ("PAHA") is a non-stock, non-profit corporation organized under the corporate law of the State of Missouri.   PAHA's membership is comprised of licensed U.S. physicians, fellows, residents, and students.   PAHA's mission is to improve access to healthcare for all Americans and to organize all like-minded physicians in the United States to develop and execute their plans in collaboration with lawmakers, community, and healthcare organizers to promote better healthcare access to all.   The goals of the organization are to increase awareness among policymakers about healthcare in underserved communities and thereby achieve better healthcare access for all Americans.

17.     Plaintiff **Hodges Bonded Warehouse, Inc.** ("Hodges Bonded Warehouse" or "Hodges") is an Alabama warehousing logistics, and transportation services corporation with its principal place of business at 125 6th Street, Montgomery, Alabama 36104.   Hodges has 108 permanent employees, most of whom are drivers, forklift and heavy equipment operators, dispatches, and logistics specialists.   At times they may employ over 15 temporary employees from local agencies. Presently, many of Hodges' clients are parts suppliers to Original Equipment Manufacturers ("OEMs") in the Southeast or to other suppliers who supply OEMs.   Hodges partners with Auburn University at Montgomery to cultivate talent in data analysis, information systems management, and supply chain management, and to create data and logistics management techniques using commonly accessible software programs.   As one example of this partnership and its ties with the H-1B program, Hodges has invested nearly $300,000 in its effort to modernize their systems, which includes training and software for the use of Xiaobei Cao ("Ms. Cao"), who is a citizen of China working to complete her Master of Science Degree in Information Management Systems at Auburn University at Montgomery and interning with Hodges on an H-1B visa.   Hodges built their modernization effort around Ms. Cao and the understanding that they would have to offer an

6

approximate 15% salary increase in order to meet the prevailing wage requirements for the H-1B program. However, Hodges would be financially unable to budget for an increase in Ms. Cao's salary to a "level 4" wage in order to have even the chance of her being selected for an H-1B visa. Should the new wage-based rule go into effect, Hodges would be unable to continue its partnership with Auburn University at Montgomery, and would be unable to continue sponsoring and hiring intelligent and hardworking international students.

18.     Plaintiff **Information Technology Industry Council** ("ITI") is a Washington, D.C.-based trade association that represents an array of vanguard companies, including cybersecurity, digital services, hardware, internet, semiconductor, software, and network equipment companies that are located across the United States and have offices around the globe. Members of ITI are at the forefront of research and development investment in the United States and, subsequently, drive domestic economic growth and job creation. To achieve these objectives, ITI members rely on U.S. citizen, lawful permanent resident, and temporary non-immigrant employees educated and trained in specialized fields, such as science, technology, engineering, and mathematics, as well as the ability to recruit these high-skilled professionals in the United States and globally. As an advocacy and policy organization for the world's leading innovation companies, ITI navigates the relationship between policymakers, companies, and non-governmental organizations, providing creative solutions that advance the development and use of technology in the United States and around the world. For over 100 years, ITI has advocated on behalf of its ITI member companies before the Executive branch, Congress, and the Courts to advance high-skilled immigration policies that supplemental and augment the U.S. workforce, protect the integrity of the employment-based, high-skilled immigration system, and enhance the education and training of domestic talent. With the dramatic shift in who would qualify for an H-1B visa under the new

policy, the change in selection criteria for H-1B visas has an immediate, negative impact on the technology sector, including ITI member companies that utilize the H-1B visa program. Numerous ITI members face a current labor shortage of high-skilled, available candidates to fill countless job vacancies. When these businesses are unable to fill an open position with a talented worker from the United States, they recruit potential employees from abroad who enter the country on an employment-based or H-1B visa. Foreign professionals on these visas work alongside U.S. workers to drive innovation, economic productivity, and U.S. job growth across the technology sector. Often, foreign national individuals contribute significantly to research and development efforts that yield in the creation of new patents, business segments, and future jobs. However, due to this shift in policy, members of ITI will not have the capacity to hire workers from abroad in the H-1B category and many jobs in the United States will go unfilled, which ultimately will stifle growth and the employment of U.S. workers.

**DEFENDANTS:**

19.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security. He is sued in his official capacity.

20.     Defendant Department of Homeland Security is a cabinet-level federal agency and is responsible for the final rule at issue.

21.     Defendant United States Citizenship and Immigrant Services is a component of the Department of Homeland Security and is responsible for implementing the final rule.

## IV.     STATUTORY AND REGULATORY BACKGROUND

### A.     THE H-1B VISA AND PETITION PROCESS

22.     The INA, 8 U.S.C. § 1101 *et seq.*, authorizes U.S. employers to sponsor foreign workers for employment in United States in a variety of visa categories, including as nonimmigrants for temporary employment under the H-1B visa classification.  8 U.S.C. § 1101(a)(15)(H)(i)(b).

23.     The H-1B visa program permits employers to temporarily employ foreign, nonimmigrant workers in specialty occupations.  *See* 8 U.S.C. § 1101(a)(15)(H). A specialty occupation is defined as an occupation that requires "theoretical and practical application of a body of highly specialized knowledge" and the occupation requires the "attainment of a bachelor's or higher degree in a specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." *Id.* § 1184(i)(1).

24.     Congress has established limits on the number of foreign workers who may be granted initial H-1B nonimmigrant visas or status each fiscal year (FY).  8 U.S.C. § 1184(g).

25.      This limitation is referred to as the "H-1B cap," generally applies to new petitions, and does not apply to H-1B petitions filed on behalf of certain individuals who have previously been counted against the cap.  8 U.S.C. § 1184(g)(7).

26.     The total number of cap-subject foreign workers who may be granted initial H-1B nonimmigrant status during any FY currently may not exceed 65,000.  8 U.S.C. § 1184(g).

27.      Certain petitions are exempt from the 65,000 numerical limitation, including H-1B workers who have earned a qualifying U.S. master's or higher degree.  8 U.S.C. §§ 1184(g)(5), (7).  Petitions for these "cap exempt" individuals may not exceed 20,000.  8 U.S.C. § 1184(g)(5)(C).

28.     H-1B petitions for individuals who are employed or have received offers of employment at institutions of higher education, nonprofit entities related to or affiliated with institutions of

higher education, or nonprofit research organizations or government research organizations, are also "cap exempt."  8 U.S.C. § 1184(g)(5).

29.     Employers complete a two-step process with respect to each selected, eligible foreign worker.  First, employers must submit a Labor Condition Application ("LCA") to the Department of Labor ("DOL") identifying the specialty occupation position at issue and confirming that they will comply with the requirements of the program.  *See* 8 U.S.C. § 1182(n)(1); 8 C.F.R. § 214.2(h)(4).  In the LCA, the prospective employer must attest, among other things, that it will pay the nonimmigrant worker the greater of "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question," or "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i).

30.     The INA specifies how these prevailing wage levels shall be calculated, stating that "where the Secretary of Labor uses, or makes available to employers, a governmental survey to determine the prevailing wage, such survey shall provide at least 4 levels of wages commensurate with experience, education, and the level of supervision."  8 U.S.C. § 1182(p)(4).

31.     After the DOL certifies the LCA, the employer moves to the second step whereby the employer must file an H-1B visa petition with the USCIS on behalf of the prospective employee, showing that the proffered position satisfies the statutory and regulatory requirements. 8 U.S.C. § 1184(c); 20 C.F.R. § 655.705(b).

**B.   THE H-1B REGISTRATION AND SELECTION PROCESS**

32.     Section 1184 of Title 8 and accompanying regulations at 8 C.F.R. § 214.2(h), set forth the detailed H-1B registration and selection process.

33.     Section 1184(g)(3) of Title 8 provides that H-1B cap numbers "shall be issued . . . in the

order in which petitions are filed for such visas or status." 8 U.S.C. § 1184(g)(3).

34.     In 2005, USCIS adopted rules changing its procedures for accepting and processing H–1B petitions. Among other things, the new rules authorized, but did not require, the use of a random computer selection process. *See Allocation of Additional H–1B Visas Created by the H–1B Visa Reform Act of 2004*, 70 Fed. Reg. 23775, 23778, 23783 (May 5, 2005) (codified at former 8 C.F.R. § 214.2(h)(8)(ii)(B) (Jan. 1, 2006).

35.     Under these procedures, USCIS estimated that it would need fill 85,000 slots for the number of petitions.  They monitored the number of petitions received and notified the public of the date that USCIS had received the necessary number of petitions (the "final receipt date"). Only applications received by the final receipt date were part of the random computer selection, and unless the final receipt date was the very first day that applications could be received, they allowed for applications on both the first and second days to be part of the random selection process.

36.     In FY2008 the limit was reached on the first day prompting USCIS to change the regulation.  *See Petitions Filed on Behalf of H–1B Temporary Workers Subject to or Exempt from the Annual Numerical Limitation*, 73 Fed. Reg. 15389 (Mar. 24, 2008) (codified at 8 C.F.R. § 214.2(h)(8)(ii)(B)).

37.     USCIS found that stopping consideration of petitions received after the final receipt date caused employers to spend significant effort and money to send petitions by overnight delivery for receipt by USCIS on the first allowable date.  *Id.* at 15,391. This also caused problems for overnight delivery carriers and for USCIS offices receiving petitions. *Id.*

38.     To better manage the process, USCIS reasonably included all petitions received within the first five business days as part of the computer selection process. *Id.* at 15,392.  After that five-day

period, cases were selected randomly, and the first 65,000 applications were selected for processing.

39.     The fiscal year for Congress begins on October 1st of every year and that is the date on which the 65,000 visas are allocated and available to new H-1B petitioners.  However, employers can file for those 65,000 visas as early as six months ahead of the actual date of need (e.g., October 1st which is also commonly referred to as the employment start date).  *See* 8 CFR 214.2(h)(2)(i)(I). USCIS has routinely received more than one hundred and fifty thousand and frequently more than two hundred thousand H-1B petitions in early April each year for inclusion in the "lottery" selection of visas allocated for the following fiscal year, and this period is informally recognized as an H-1B "cap season."

40.     The annual demand for H-1B visas almost always outstrips the annual supply.  For example, for FY2020, USCIS received 201,0011 H-1B petitions during the filing period.  *USCIS Completes the H-1B Cap Random Selection Process for FY 2020 and Reaches the Advanced Degree Exemption Cap,* https://www.uscis.gov/news/alerts/uscis-completes-the-h-1b-cap-random-selection-process-for-fy-2020-and-reaches-the-advanced-degree (posted April 11, 2019, accessed March 18, 2021).

41.     Prior to 2019, USCIS monitored the number of H-1B cap-subject petitions received and notified the public of the date that USCIS received enough petitions needed to reach the numerical limit (the "final receipt date").  *Registration Requirement for Petitioners Seeking To File H–1B Petitions on Behalf of Cap-Subject Aliens*, 84 Fed. Reg. 888, 894 (Jan. 31, 2019).  USCIS then randomly selected from the cap-subject petitions received on the final receipt date from the projected number of petitions needed to reach the limit.  *Id.*  Once the selection process for the

20,000 advanced degree exemption was complete, USCIS then randomly selected petitions that apply to the projections needed to reach the 65,000 regular cap limit.  *Id*.

42. In 2019, USCIS changed the registration process and introduced an electronic registration process for employers who intend to participate in the H-1B program for that fiscal year. 84 Fed. Reg. at 888-94, (codified at 8 C.F.R, § 214.2(h)(8)(iii)).  Prospective petitioners seeking to file H-1B cap-subject petitions, including for beneficiaries eligible for the advanced degree exemption, must first electronically register and then pay the associated $10 H-1B registration fee for each beneficiary.  8 C.F.R. § 214.2(h)(8)(iii)(A)(1); 84 Fed. Reg. at 919; https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process.

43.    Under this process, prospective petitioners (referred to as registrants), and their authorized representatives, who are seeking authorization to employ H-1B workers subject to the H-1B cap, complete an online registration process that requests information about the prospective petitioner and each requested worker.  *Id*.

44.    Under the current process, USCIS opens an initial registration period for a minimum of 14 calendar days beginning in March.  8 C.F.R. §§ 214.2(h)(8)(iii)(A)(2)-(4). Only those with selected registrations may proceed to file H-1B cap-subject petitions for eligible workers.  *Id*.

45.    Randomized selections of registrants then take place after the close of the initial registration period.  8 C.F.R. § 214.2(h)(8)(iii)(A)(5).  Along with implementing an electronic registration requirement, USCIS also changed the manner of selection: it first selects H-1B registrations towards the projected number of petitions needed to meet the 65,000 regular cap limits, including all cap-subject beneficiaries, which are those who are in jobs which do not require a Master's degree from a U.S. institution of higher education.  8 C.F.R. §§ 214.2(h)(8)(iii)(A)(5).  Then,

USCIS selects registrations that are eligible for the 20,000 advanced degree exemption, which are those with master's degrees or higher from U.S. institutions of higher education, towards the projected number needed to reach the advanced degree exemption. *Id.* USCIS adopted this change "to allow those petitions with beneficiaries who have a master's degree or higher from U.S. institutions of higher education a greater chance to be selected." 84 Fed. Reg. at 924

46.     Once USCIS conducts the random registration lottery, a prospective petitioner whose registration is selected is then eligible to file an H-1B cap-subject petition for the selected registration during the associated filing period.

## V.     THE UNLAWFUL FINAL RULE

47.     In January 2019, USCIS publicly recognized that ranking and prioritizing H-1B cap registrations on factors other than degree level, such as wages, required a legislative change. *Registration Requirement for Petitioners Seeking To File H–1B Petitions on Behalf of Cap Subject Aliens*, 84 Fed. Reg. 888, 913 (Jan. 31, 2019). Specifically, the agency stated in response to a comments advocating for prioritization of selections based on criteria, such as wage levels as follows:

> DHS believes that reversing the cap selection order to prioritize beneficiaries with a master's or higher degree from a U.S. institution of higher education is a permissible interpretation of the existing statute, as explained in detail in response to other comments in this preamble. DHS believes, however, that prioritization of selection on other bases such as those suggested by the commenters would require statutory changes.

*Id.*

48.     Eleventh months later, shortly before the Presidential election in November 2020, USCIS unexplainedly changed position and published a notice of proposed rulemaking to prioritize the selection process based on wage levels. 85 Fed. Reg. 69236 (Nov. 2, 2020).

49.     "DHS received 1103 comments during the 30-day public comment period, and 388 comments on the rule's information collection requirements before the comment period ended." 86 Fed. Reg. at 1678.

50.     Despite the overwhelming opposition of commenters, the final rule held steadfast to selections for the H-1B program based on wage levels, starting with the highest wage level, and moving downward until reaching the statutory limit.  86 Fed. Reg. at 1676.

51.     Defendants predict that under the new rule, no individuals paid Level I wages would be selected.  *Modification of Registration Requirement for Petitioners Seeking to File Cap-Subject H-1B Petitions*, 85 Fed. Reg. 69236, 692253 (Nov. 2, 2020).

52.     On the other hand, Defendants further aver that all individuals paid at a Level III and Level IV level would be selected, and perhaps 75% of Level II wage workers as well.  *Id.*

53.     Approximately 14% of H-1Bs are selected at the Level 1 wage under the process now in effect.  *H-1B vias and Prevailing wage levels*, Economic Policy Institute, May 2, 2020, by Daniel Costa and Ron Hira, https://www.epi.org/publication/h-1b-visas-and-prevailing-wage-levels/.

54.     As Defendants previously admitted, prioritizing selections on wages contravenes the plain language of the INA, 84 Fed. Reg. at 913; 86 Fed. Reg. at 1676, because the agency would not consider registrations "in the order in which petitions are filed."  8 U.S.C. § 1184(g)(3).

55.     Contrary to its longstanding position, and, of course, the plain language of the text of the statute, USCIS now claims that "the statute is silent as to how USCIS must select H-1B petitions, or registrations, to be filed toward the numerical allocations in years of excess demand.  DHS, therefore, is relying on its general statutory authority to implement the statute and proposes to revise the regulations to design a selection system that realistically, effectively, efficiently, and

more faithfully administers the cap selection process."  86 Fed. Reg. at 1695, *citing* 8 U.S.C. §§ 1103(a), 1184(a) and (c)(1). (emphasis added)

56.     Nothing in the authority delegated to the agencies under the INA grants the agencies the authority to rewrite the statute.  *Id*.  Nor does the statute in any way permit the agencies to select H-1B petitioners based on the highest wages paid.

57.     The final rule contravenes 8 U.S.C. § 1184(g) as it allocates H-1B cap numbers based on wages, and not "in the order in which petitions are filed."  8 U.S.C. § 1184(g)(3).  Nothing in the statute allows for a different manner of allocating H-1B cap numbers or H-1B petitions for any year in which the registration requirement is suspended.  *Id*.

58.     USCIS further misapprehends the statute by incorrectly stating that "a registration system that faithfully implements the Immigration and Nationality Act (INA) while prioritizing registrations based on wage level within each cap will incentivize H-1B employers to offer higher wages, or to petition for positions requiring higher skills and higher-skilled aliens that are commensurate with higher wage levels, to increase the likelihood of selection and eligibility to file an H-1B cap-subject petition." 86 Fed. Reg. at 1677.

59.     Through the wage dependent selection process, USCIS admittedly seeks to "maximize H-1B cap allocations, so that they more likely will go to the best and brightest workers; and it will disincentivize abuse of the H-1B program to fill relatively lower-paid, lower-skilled positions, which is a significant problem under the present selection system."  *Id*.

60.     Defendants offer no rational explanation how wages alone accurately reflect "the best and brightest workers."  *Id*.  Nor do they explain their bold statement that workers paid at wage level I or II are "lower-skilled" positions.  On the contrary, by definition, the H-1B is designed specifically for highly skilled "specialty occupation" workers, at all levels of compensation.

61.     The final rule not only contravenes the statutory and regulatory criteria governing the selection process, but it also arbitrarily and capriciously associates wages with marketplace and economic value.

62.     The practical affect will supersede the eligibility criteria for H-1B nonimmigrants that does not prioritize based on wage levels because the statutory and regulatory criteria have never before placed wages as the determinant factor for such petitions.

63.     The practical effect of the rule will be to overwrite the multi-factor statutory and regulatory model for H-1B cap numbers as well as petitions because it would exclude all those working in specialty occupations that do not offer the highest wages.

64.     One can then extrapolate to the industries that rely on highly talented foreign labor, but by nature of their industries will not be able to pay Level III or Level IV wages, nor is it industry standard to do so.   Non-profits, start-ups, and rurally located and small businesses will be completely shut out of the H-1B program.

65.     On an individual level, recent college graduates will also be shut out of the program as H-1Bs will only go to workers who have significant work experience that would justify a Level IV wage.

66.     The final rule arbitrarily, capriciously, and unlawfully equates salary with value and makes the H-1B cap program dependent a one factor.

### VI.     THE FINAL RULE WAS ISSUED BY UNLAWFULLY APPOINTED OFFICERS

67.     Neither Mr. Wolf, nor Mr. Brekke who was assigned to sign the final rule, had the legal and valid authority to promulgate the final rule.  86 Fed. Reg. at 1731.

68.     Both the Secretary and the General Counsel for DHS require Presidential appointment and advice and consent of the Senate.  6 U.S.C. §§ 112(a)(1) (Secretary DHS), 113(a)(1)(J) (General Counsel).

69.     The Senate never confirmed Mr. Wolf or Mr. Brekke to their purported positions.

70.     Neither Mr. Wolf, nor Mr. Brekke served in a lawful capacity upon approval of the final rule.

71.     Under the Appointments Clause, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers, of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law."  U.S. Const., Art. II, § 2, cl. 2.

72.     Congress has also enacted various statutes that govern the appointment of acting officials, including the Federal Vacancies Reform Act ("FVRA") and the Homeland Security Act ("HSA"), a DHS-specific statute.

73.     The FVRA specifies the categories and tenures of individuals who may serve in an acting capacity when a Senate-confirmed position, such as DHS Secretary or General Counsel, is vacant.  *See* 5 U.S.C. §§ 3345-3349d.

74.     Under the FVRA, the "first assistant" to the vacant office automatically assumes the acting role unless the President designates another official in accordance with the Act's requirements. 5 U.S.C. § 3345(a)(1).

75.     Unless a limited exception applies, an acting official may not serve beyond 210 days after the position becomes vacant. 5 U.S.C. § 3346(a).  One exception is that an official may serve in an acting capacity "once a . . . nomination for the office is submitted to the Senate, from the date

of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. § 3346(a)(2).

76.    Once the allotted period has elapsed, the FVRA mandates that "the office shall remain vacant." *See* 5 U.S.C. § 3348(b).

77.    Unless a limited exception applies, an individual whose nomination is pending in the Senate may not serve pursuant to the FVRA in an acting capacity in the office for which their nomination is pending. 5 U.S.C. § 3345(b)(1)(B).

78.    Actions taken by officers acting in violation of the FVRA "shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(d).

79.    The FVRA is the "exclusive means" for designating acting officials for Senate-confirmed positions, unless another statute "expressly" authorizes another mechanism. 5 U.S.C. § 3347(a).

80.    The HSA sets out the order of succession for vacancies arising in the position of Secretary of Homeland Security. 6 U.S.C. §§ 113(a)(1)(A), (F); § 113(g).

81.    The Deputy Secretary and then the Under Secretary for Management are each designated as "first assistant" to their immediate superiors and thus remain first and second in line to serve as Acting Secretary. 6 U.S.C. §§ 113(a)(1)(F), (g)(1).

82.    Furthermore, "the Secretary may designate" other DHS officers "in a further order of succession to serve as Acting Secretary" if the first two offices in the order of succession are vacant.  6 U.S.C. § 113(g)(2).

83.    An Acting Secretary may perform the duties of a principal officer for a limited period.

84.    An Acting Secretary, as an inferior officer, may not lawfully designate another Acting Secretary.

85.     Until the confirmation of DHS Secretary Alejandro Mayorkas on February 2, 2021, there had not been a Senate-confirmed DHS Secretary since the departure of former Secretary Kirstjen Nielsen on April 10, 2019.

86.     On September 10, 2020, President Trump nominated Mr. Wolf to serve as DHS Secretary and submitted his nomination for Senate confirmation.

87.     On January 7, 2021, the White House later announced the withdrawal of Wolf's nomination and he resigned, effective January 11, 2021, at 11:59 P.M.

88.      Mr. Wolf never served as the first assistant to the DHS Secretary, and thus he did not lawfully serve as Acting DHS Secretary during the pendency of his nomination under the FVRA. See 5 U.S.C. § 3345(b)(1).

89.     Mr. Wolf was never appropriately designated as Acting Secretary under the HSA because his predecessors failed to properly modify the order of succession under the HSA to place him in line for the role.

90.     At least six district courts have held that Mr. Wolf and his purported predecessor, Kevin K. McAleenan, lacked authority to serve as Acting DHS Secretary and invalidated certain rules and policies they promulgated while serving unlawfully. *See Pangea Legal Services v. DHS*, No. 20-cv9253, 2021 WL 75756, at *5 (N.D. Cal. Jan. 8, 2021); *La Clinica De La Raza v. Trump*, No. 19-cv4980, 2020 WL 7053313, at *6-7 (N.D. Cal. Nov. 25, 2020); *Batalla Vidal v. Wolf*, No. 16-cv-4756, 2020 WL 6695076, at *8 (E.D.N.Y. Nov. 14, 2020); *Nw. Immigrant Rights Project v. USCIS*, No. 19-cv-3283, 2020 WL 5995206, at *24 (D.D.C. Oct. 8, 2020); *Immigrant Legal Resource Center (ILRC) v. Wolf*, No. 20-cv-5883, 2020 WL 5798269, at *7-9 (N.D. Cal. Sept. 29, 2020); *Casa de Maryland, Inc. v. Wolf*, No. 20-cv-2118, 2020 WL 5500165, at *23 (D. Md. Sept. 11, 2020).

91.    Prior to and after each ruling, DHS has taken an incorrect position as to the order of succession under the FVRA and HSA since April 2019, when Secretary Nielsen resigned.

92.    At the time of Secretary Nielsen's resignation, DHS had two different orders of succession, one of which was applicable to any vacancy caused by a resignation and another to any vacancy caused by an emergency.  *See DHS Delegation No. 106* (Revision No. 08.5), *DHS Orders of Succession and Delegations of Authority* (Apr. 10, 2019); *Exec. Order No. 13,753*, 81 Fed. Reg. 90,667 (Dec. 9, 2016).

93.    Prior to her resignation, Secretary Nielsen designated the Customs and Border Protection Commissioner, who at that time was Mr. Kevin McAleenan, as the next in line to serve as Acting Secretary **in the event of an emergency, but not in the event of a resignation**.

94.    Upon Secretary Nielsen's resignation, Mr. McAleenan incorrectly assumed the role of Acting Secretary.

95.    Mr. Christopher Krebs, then the Director of the Cybersecurity and Infrastructure Security Agency (formerly known as Under Secretary for National Protection and Programs), should have assumed the role of the Acting Secretary, but did not.

96.    On November 8, 2019, the 212th day after Secretary Nielsen resigned, Mr. McAleenan attempted to revise DHS Delegation 106 to consolidate the emergency and resignation orders of succession under the HSA, 6 U.S.C. § 113(g)(2). *DHS Delegation No. 106, Revision No. 8.6, DHS Orders of Succession and Delegations of Authority* (Nov. 8, 2019) ("November Delegation").

97.    The November Delegation elevated Under Secretary for Strategy, Policy, and Plans as the "first assistant" successor.  *Id*.  At this time, Mr. Wolf served as the Under Secretary for Strategy, Policy, and Plans.

98.    The November Delegation was a nullity, however, because Mr. McAleenan was not lawfully serving as Acting Secretary.  The previous line of succession remained in effect.

99.    The HSA restricts the authority to change the order of succession to a Senate-confirmed DHS Secretary.  *See* 6 U.S.C. § 113(g)(2).

100.    Even if Secretary Nielsen had correctly placed Mr. McAleenan in line to serve as the Acting Secretary, he could not make further changes to the order of succession because he only held an "Acting" position.

101.    On November 13, 2019, Mr. McAleenan resigned from his role as CBP Commissioner and his purported role as Acting DHS Secretary.

102.    Mr. Wolf incorrectly assumed the role of Acting DHS Secretary under Mr. McAleenan's November Delegation.

103.    On August 14, 2020, the Government Accountability Office ("GAO") concluded that neither Mr. McAleenan nor Mr. Wolf lawfully served as the Acting DHS Secretary.  *See GAO, No. B-331650, Decision: Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security* ("GAO Decision") (Aug. 14, 2020), https://tinyurl.com/yyf2eqew.

104.    Under the GAO Decision, DHS's succession orders at the time of Nielsen's resignation assigned the Acting DHS Secretary role to Mr. Krebs, who never assumed the position. *Id.*

105.    Mr. Wolf disregarded the GAO decision and continued his unlawful tenure as Acting DHS Secretary.

106.    On September 10, 2020, former President Trump nominated Mr. Wolf for the position of the DHS Secretary and submitted his nomination for Senate confirmation.

107.     Prior to his nomination, Mr. Wolf's service as Acting DHS Secretary, if true, would have violated the time limitations under the Appointments Clause.

108.     According to a memorandum issued by Mr. Wolf, if Mr. McAleenan's November Delegation had been invalid, Peter Gaynor, the Administrator of the Federal Emergency Management Agency ("FEMA") would have become Acting DHS Secretary by operation of law. 85 Fed. Reg. 59,651, 59,653 (Sept. 23, 2020).

109.     Mr. Gaynor then borrowed the same flawed playbook to re-install Mr. Wolf to the position of Acting Secretary.

110.     On the same day of Mr. Wolf's nomination, Mr. Gaynor issued a memo titled, "Order Designating the Order of Succession for Secretary of Homeland Security" ("Gaynor Memo").

111.     In that order, Mr. Gaynor purported to exercise authority under 6 U.S.C. § 113(g)(2) to adopt the same November Delegation that Mr. McAleenan had issued to re-install Mr. Wolf as Acting Secretary.

112.     On November 14, 2020, Mr. Gaynor reissued the same memo because the original memo may have been issued before he could have assumed the office of Acting Secretary.  *See Peter T. Gaynor, Order Designating the Order of Succession for the Secretary of Homeland Security* (Nov. 14, 2020).

113.     Mr. Gaynor purported to exercise "any authority vested in [him] as Acting Secretary" pursuant to the order of succession in place when Secretary Nielsen resigned in April 2019 and to use that authority to re-amend the order of succession to re-assign the Acting Secretary role to Mr. Wolf.  *Id.*

114.     Following Mr. Gaynor's Delegation Memos, Mr. Wolf attempted to ratify all past actions taken during his and Mr. McAleenan's unlawful tenures.

115. However, as Acting Secretary, Mr. Gaynor lacked the authority to adopt change the order of succession because only a Senate-confirmed Secretary of Homeland Security had such authority.

116. The Gaynor Delegation Memo, like Mr. McAleenan's November Delegation, was a nullity.

117. Gaynor never even properly assumed the role of Acting Secretary. He was never sworn in, and DHS never submitted any notice to Congress that Administrator Gaynor was serving as Acting Secretary, as it has done for past Acting Secretaries.

118. Nor did Gaynor resign as FEMA Administrator, Acting Secretary or otherwise create a new vacancy in the role of Acting Secretary.

119. Mr. Wolf was never lawfully designated to serve as Acting Secretary pursuant to 6 U.S.C. § 113(g)(2), and never lawfully held the authority assigned to an Acting DHS Secretary.

120. Even if he did assume the role of Acting Secretary, Mr. Wolf could not lawfully ratify prior actions that had no force or effect under the FVRA and he had no independent, rational basis to properly ratification of his own misdeeds. 5 U.S.C. § 3348(d)(2).

121. On January 8, 2021, Mr. Wolf purported to promulgate the final rule despite as DHS Acting Secretary.

122. Mr. Wolf's repeated ratification attempts of his unlawful policies were improper and unlawful.

123. Indeed, the FVRA precluded the parade of ratification attempts by Mr. Wolf and Mr. Gaynor. *See* 5 U.S.C § 3348(d)(2).

124. On January 7, 2021, the White House announced that Wolf's nomination as DHS Secretary had been withdrawn.

125.    On January 11, 2021, Wolf announced his resignation as Acting Secretary, effective that night at 11:59 P.M., citing the number of "meritless" court rulings that he was unlawfully serving as Acting Secretary.

126.    Prior to his resignation, Mr. Wolf, in his assumed position as the Acting Secretary, purported to designate a new order of succession to install Mr. Gaynor as the Acting DHS Secretary.    https://www.dhs.gov/sites/default/files/publications/20_0113_undersecretary-wolf-ratificationdelegable-prior-actions.pdf.

127.    Mr. Wolf's designation of Mr. Gaynor was ineffective.

128.    Although Mr. Wolf purported to resign as Acting Secretary, he resumed his prior role as Under Secretary for Strategy, Policy, and Plans.

129.    The day after Mr. Wolf's resignation as Acting Secretary, Mr. Gaynor attempted to delegate the full extent of the Secretary's rulemaking authority back to Mr. Wolf.  DHS Delegation No. 23028, Delegation to Mr. Wolf.

https://www.dhs.gov/sites/default/files/publications/20_0112_delegation-23028-final-rules-regulations-other-matters.pdf.

130.    Two days later, on January 14, 2021, Mr. Wolf issued his third and final ratification memo, approving each of his previously unauthorized actions as Acting Secretary, as well certain of Mr. McAleenan's unauthorized rulemaking.

https://www.dhs.gov/sites/default/files/publications/20_0113_undersecretary-wolf-ratification-delegable-prior-actions.pdf.

131.    This constituted Mr. Gaynor and Mr. Wolf's last maneuver to circumvent constitutional and statutory limits on their authority violated the FVRA, the Appointments Clause, and principles of ratification.

132.    Any vacancy in the office of General Counsel for DHS is subject to the FVRA's requirements, including the statute's 210-day limit on the service of acting officers. 5 U.S.C. § 3345(a) (making FVRA applicable to any office for which an appointment "is required to be made by the President, by and with the advice and consent of the Senate"); *id*. § 3346 (providing an aggregate limit of 210 days for service by acting officers, starting from the date of the vacancy).

133.    The most recent Senate-confirmed General Counsel for DHS, John Mitnick, was fired on September 17, 2019.

134.    The 210-day period during which an acting official may discharge the duties of General Counsel therefore elapsed on April 15, 2020.

135.    Mr. Brekke who signed the final rule as the Senior Official Performing the Duties of the General Counsel for DHS lacked the authority to do so and received the duty from Mr. Wolf who had no authority to make such a delegation.

136.    Mr. Brekke's signature on the Final Rule is without force and effect, and the final rule was published in the Federal Register without the requisite authority.  *See* 5 U.S.C. § 553(d) (substantive rules may not take effect until at least 30 days after required publication).

137.    No officer had the lawful authority to promulgate the final rule.

## VII.    HARMS TO PLAINTIFFS

### A.  COLLECTIVE HARMS TO PLAINTIFFS

138.    The final rule will deprive plaintiffs of a meaningful opportunity to participate in the H-1B program.

139.   The final rule will drastically reduce access to the H-1B program for early-career professionals, including those who have completed an undergraduate, graduate, and professional or doctoral degree at American universities and colleges.

140.   The final rule will harm Plaintiffs who depend on new and recent graduates for specialty occupations.  There is a shortage of American workers and most jobs will now go unfilled, thereby impeding growth and the business plans of American businesses.

141.   Employers have relied on access to highly educated and talented professionals for growth, of which foreign nationals are a critical component.

142.   The agency's wage dependent model under the final rule will have the opposite effect the agency claims the rule will achieve; many of the best and brightest will lose the opportunity for a career in the United States, not gain one.

143.   Plaintiffs will experience a dramatic increase in operational costs due to the final rule.

144.   The final rule will make it impossible for Plaintiffs to maintain the same cost-structure and employment levels. If they have not already done so, Plaintiffs will be forced to forego or reduce hiring, or terminate employees due to the new rule, including US workers.

145.   The final rule will disparately impact small businesses, start-ups, non-profits, and rurally located businesses. These companies lack the ability to shift employees or operations abroad.

146.   Studies have shown that H-1B workers in fact benefit US workers. For overview of value of H-1B professionals to the United States economy see, Alex Nowsareth, *Don't Ban H-1B Workers:  They are Worth their Weight in Innovation,* CATO  Institute (May 14, 2020) available at:   https://www.cato.org/blog/dont-ban-h-1b-workers-they-are-worth-their-weight-patents   and Madeline Zavodny, *The Impact of H-1B Visa Holders on the U.S. Workforce*, National Foundation for   American   Policy   Brief   (May   2020),   available   at https://nfap.com/wp-

content/uploads/2020/05/The-Impact-of-H-1B-Visa-Holders-on-the-U.S.-Workforce.NFAP-Policy-Brief.May-2020.pdf.

147.     The existence of the H-1B program causes some employers to expand – or at least not decrease – the number of jobs open to American workers, even workers who hold jobs like those held by H-1B workers. If not enough U.S. workers are available and an employer cannot use the H-1B program, the employer moves jobs in each position overseas, ultimately reducing job opportunities for American workers.  See, *Restrictions on H-1B Visas Found to Push Jobs Out Of The U.S.*, Forbes.com, October 2, 2019, by Stuart Anderson, https://www.forbes.com/sites/stuartanderson/2019/10/02/restrictions-on-h-1b-visas-found-to-push-jobs-out-of-the-us/?sh=4e41bd765a85.

**B.  HEALTHCARE WORKERS**

148.     Plaintiffs in medical-related fields rely on highly skilled and highly educated professionals in the healthcare industry, including nurses, physical therapists, occupational therapists, dentists, and similarly situated health care workers. These medical professionals provide critical care to our rapidly aging population in nursing homes, assisted living facilities and hospitals.   Initial registrations for these H-1B workers fall are assigned a Level I wage.  They also provide therapy services to injured workers and the foreign national nurses are on the front lines in the fight against Covid-19. Nurses and Physical Therapists are recognized shortage occupations, and, unlike non-shortage occupations, their U.S. employers are not required to test the labor market in permanent residence filings as the Federal government acknowledges there are not enough U.S. workers in these occupations. Many (if not most) of the facilities that employ these professionals do not directly hire them and – instead – turn to expert staffing services. These services operate on very

tight margins to provide staff to the affected facilities at rates that are presently affordable for elderly residents, and patients and at rates which insurance companies are willing to reimburse.

149.    Plaintiffs will now lack the opportunity to participate in the H-1B registration process. Given the recognized shortages in these occupations, America's aging parents and grandparents, injured workers and people needing nursing care more generally will have greatly reduced or, in some locations, no access to these healthcare services.

150.    Approximately 1/4 of the U.S. Physician workforce is comprised of international medical graduates. These physicians are not only working on the frontlines of the COVID-19 response, but also dedicate their lives to the provision of healthcare in our most vulnerable and underserved medical populations in the U.S. The upward departure from industry norms under the final rule will dramatically restrict plaintiffs from employing the necessary international talent resulting in a direct and immediate impact on the provision of medical care. Furthermore, there are many factors beyond the control of an employer that factor into determining physician salaries including the fact that graduate medical residents are subsidized by Medicare dollars and that insurance companies tightly control what physicians are paid, for the services they provide.

## VIII.   CAUSES OF ACTION

### 1.   FIRST CAUSE OF ACTION:
**VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT AND THE IMMIGRATION AND NATIONALITY ACT.**

151.    Plaintiffs incorporate and reallege the allegations above.

152.    The APA § 706 provides, in relevant part, that the reviewing court shall--

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> ...

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law; ....

5 U.S.C. § 706(2).

153.     The final rule constitutes final agency action as it has the force of law and constitutes a legislative rule.  5 U.S.C. § 553(b).

154.     Courts will invalidate final agency action that fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 43 (1983) (citation omitted).

155.     Furthermore, when an agency substantially alters a position, it must "supply a reasoned analysis for the change," *State Farm*, 463 U.S. at 42, and may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) (*citing United States v. Nixon*, 418 U.S. 683, 696 (1974)).

156.     The final rule sets forth a wage dependent registration process for the H-1B program in violation 8 U.S.C. § 1184(g).

157.     One of the most basic canons of statutory construction is that words should be given their ordinary, everyday meanings absent a specific definition provided by Congress.   *U.S. Congressional Research Service, Statutory Interpretation: Theories, Tools, and Trends* (R45153, Apr. 5, 2018)

158.     Using wages to determine who is selected for the H-1B program is not permitted by the implementing statute, which prescribes that H-1B are supposed to be issued "in the order in which petitions are filed . . ." 8 USC 1184(g)(3)

159.    The wage rates further conflicts with 8 U.S.C. § 1184(i) and 8 C.F.R. § 214.2(h)(4)(ii), which specifically designate certain professions as "specialty occupations" eligible for H-1B visas that do not require a master's degree; indeed, the standard is for a bachelor's or its equivalent.

160.    The final rule is not in accordance with the INA and should be set aside.

## 2.  SECOND CAUSE OF ACTION:
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

161.    Plaintiffs incorporate and reallege the allegations above.

162.    The final rule is arbitrary, capricious, and not in accordance with law because Defendants failed to examine, ignored and misapprehended empirical evidence and data used to support its regime change for the H-1B registration and selection process to one dependent on wage levels.

163.    The final rule is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in its longstanding policy; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decision that run counter to the evidence before the agency.

164.    Prior to transforming the longstanding registration process, the agency admitted that it could not make the process dependent on wages through promulgation of a rule.

165.    The final rule fails to offer reasoned explanation to support how its new wage dependent selection process..

166.    The final rule entirely fails to consider numerous important aspects of the problem including how it concluded that the best and brightest workers bear a relationship to the wages paid to such workers.

167.    Moreover, USCIS misapprehended the data it relied on and failed to adequately explain its reasoning.

### 3.   THIRD CAUSE OF ACTION:
#### VIOLATION OF THE HOMELAND SECURITY ACT AND FEDERAL VACANCIES AND REFORM ACT

168.   All the foregoing allegations are repeated and realleged as if fully set forth herein.

169.   Mr. Wolf improperly and unlawfully assumed and performed the duties of an Acting DHS Secretary, including promulgation of the final rule.

170.   The memo issued by Peter Gaynor, which attempted again to elevate Mr. Wolf to Acting Secretary on September 10, 2020, and again on November 14, 2020, was unlawful under 6 U.S.C. § 113(g)(2), because Mr. Gaynor did not properly assume the role of Acting Secretary.

171.   Mr. Wolf never became Acting DHS Secretary and could not perform the duties of an Acting DHS Secretary.

172.   Because Mr. Wolf never properly served as the Acting DHS Secretary, his promulgation of the final rule is unlawful, void *ab initio* pursuant to 5 U.S.C. § 3348(d)(1) and must be set aside as "not in accordance with law" and "in excess of . . . authority" under the APA. 5 U.S.C. § 706(2)(A), (C). *See also* 6 U.S.C. § 112(e) (identifying "issuance of regulations" as a "function" of the DHS Secretary); *see also* 8 U.S.C. § 1103(a)(3) (assigning powers and duties of the Secretary to include establishing regulations).

173.   Mr. Wolf's unlawful actions as Acting DHS Secretary may not be ratified, *see* 5 U.S.C. § 3348(d), and the ratifications undertaken by Mr. Wolf himself had no curative effect.

### 4.   FOURTH CAUSE OF ACTION:
#### VIOLATION OF THE FEDERAL VACANCIES REFORM ACT AND TIME LIMITATIONS

174.   Plaintiffs incorporate and reallege the allegations above.

175.   The office of DHS Secretary became vacant upon Secretary Nielsen's resignation on April 10, 2019. The 210-day time limit for an Acting Secretary therefore expired on November 6, 2019.

176.    Mr. McAleenan's November Delegation was issued on November 9, 2019, after the 210 days permitted by the FVRA, the November Delegation purporting to elevate Mr. Wolf to Acting Secretary had no "force or effect." 5 U.S.C. § 3348(d)(1).

177.    Additionally, Mr. Wolf's ratification of the final rule remain invalid because both occurred outside of the 210-day period of service allowed under the FVRA.

178.    The final rule is without force and effect under the FVRA, 5 U.S.C. § 3348(d)(1), and shall set aside as "not in accordance with law" and "in excess of … authority" under the APA. 5 U.S.C. § 706(2)(A), (C).

179.    Mr. Wolf's unlawful actions may not be ratified, *see* 5 U.S.C. § 3348(d), and the ratification attempts by Mr. Wolf himself had no curative effect.

### 5.   FIFTH CAUSE OF ACTION:
**VIOLATION OF THE APPOINTMENTS CLAUSE OF THE CONSTITUTION AND ADMINISTRATIVE PROCEDURE ACT**

180.    Plaintiffs incorporate and reallege the allegations above.

181.    The appointment of an Acting DHS Secretary with an indefinite term of office violates the Appointments Clause of the United States Constitution, and the Acting DHS Secretary's actions must be set aside as contrary to law.

182.    The Appointments Clause provides that principal officers of the United States, including heads of executive departments, must be appointed by the President "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2.

183.    An acting officer—who is carrying out the functions of a principal officer—is an inferior officer and may serve in that capacity only for a limited time.

184.    As head of department, the Secretary of Homeland Security is a principal officer.

185.    By purporting to exercise the functions and duties of the Secretary of Homeland Security free from any time limitation, Mr. McAleenan, Mr. Wolf, and Mr. Gaynor have sought to serve as principal officers. Because they were not nominated by the President or confirmed by the Senate, their service as principal officers violated the Appointments Clause.

186.    When Mr. Wolf purported to approve the Final Rule, the office of the Secretary of Homeland Security had been vacant without a permanent appointee for almost two years.

187.    Mr. Wolf became the longest-serving Secretary of DHS under this administration, acting or otherwise, surpassing both John Kelly and Kirstjen Nielsen, the two Senate-confirmed Secretaries of DHS.

188.    Mr. Wolf's unlawful tenure became indistinguishable from that of a permanent, Senate-confirmed DHS Secretary, making him a principal officer.

189.    Thus, even if Mr. Wolf's service as Acting DHS was consistent with the HSA and FVRA, his indefinite ascension to that office without the advice and consent of the Senate violated the Appointments Clause of the Constitution.

190.    Because Mr. Wolf's purported service as Acting DHS Secretary was in violation of the Appointments Clause, his approval of the final rule was unlawful.

191.    The final rule is invalid and must be vacated as contrary to law and constitutional authority, 5 U.S.C. § 706(2)(B).

192.    Mr. Wolf's unlawful actions may not be ratified, *see* 5 U.S.C. § 3348(d), and the ratification attempts by Mr. Wolf himself had no curative effect.

### 6.   SIXTH CAUSE OF ACTION:
#### VIOLATION OF THE FEDERAL VACANCIES REFORM ACT AND ADMINISTRATIVE PROCEDURE ACT

193.    Plaintiffs incorporate and reallege the allegations above.

194.   Mr. Wolf lacked the authority to delegate the authority to sign the final rule to Ian Brekke, as the official discharging the duties of General Counsel for DHS.

195.   The most recent Senate-confirmed General Counsel for DHS, John Mitnick, was fired on September 17, 2019.

196.   Ian Brekke was not lawfully performing the functions and duties of the office of General Counsel for DHS, which, under the FVRA, was required to remain vacant after 210 days. 5 U.S.C. § 3348(b).

197.   Because Mr. Brekke's acting service violated the FVRA, his attempt to sign the final rule on Mr. Wolf's behalf was without force and effect.

198.   Because Mr. Brekke was not lawfully serving as an officer or employee of DHS, Mr. Wolf could not lawfully delegate the Secretary's functions to him. *See* 6 U.S.C.§ 112(b)(1) (limiting the delegation of "any of the Secretary's functions to any officer, employee, or organizational unit of the Department").

199.   No one had the lawful authority to publish the final rule.

200.   Because the final rule was not lawfully published, the APA precludes it from taking effect. *See* 5 U.S.C. § 553(d).

201.   Accordingly, the Final Rule must be set aside as "not in accordance with law" and "in excess of statutory . . . authority" under the APA. 5 U.S.C. § 706(2)(A), (C).

202.   Mr. Brekke's unauthorized signing of the Final Rule may not be ratified, see 5 U.S.C. § 3348(d).

## IX.   RESERVATION OF RIGHTS

Plaintiffs reserve the right to add additional allegations of agency error and related causes of action upon receiving the certified administrative record.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following relief:

A.    Assume jurisdiction over the matter.

B.    Declare, pursuant to 28 U.S.C. § 2201, that the final rule is unlawful and invalid.

C.    Order that the final rule violates the APA and other federal statutes, which mandates that the rule   be set aside in its entirety pursuant to 5 U.S.C. § 706(2)(A);

D.    To the extent necessary, issue all additional relief to postpone the effective date of the final rule action or to preserve status or rights pending conclusion of the review proceedings pursuant to 5 U.S.C. § 705;

E.    Award Plaintiffs costs of suit and attorney's fees under the Equal Access to Justice Act, 42 U.S.C. § 1988 and any other applicable law;

F.    Enter all necessary relief, injunctions, and orders as justice and equity as appropriate to remedy the harms to plaintiffs;

G.    Grant such further relief as this Court deems just and proper.

Respectfully Submitted this 17th day of May 2021,

<table>
<tr><td></td><td>/s/ Jeff Joseph</td></tr>
<tr><td>Jesse Matthew Bless</td><td>Jeff D. Joseph</td></tr>
<tr><td>American Immigration Lawyers Association</td><td>Joseph & Hall P.C.</td></tr>
<tr><td>1301 G Street NW, Ste. 300</td><td>12203 East Second Avenue</td></tr>
<tr><td>Washington, D.C. 20005</td><td>Aurora, CO 80011</td></tr>
<tr><td>jbless@aila.org</td><td>jeff@immigrationissues.com</td></tr>
<tr><td>D.D.C. Bar No: MA0020</td><td>D.C. Bar ID: CO0084</td></tr>
<tr><td></td><td></td></tr>
<tr><td>Greg Siskind</td><td>Charles H. Kuck</td></tr>
<tr><td>Siskind Susser PC</td><td>Kuck Baxter Immigration</td></tr>
<tr><td>1028 Oakhaven Rd.</td><td>365 Northridge Rd, Suite 300</td></tr>
<tr><td>Memphis, TN 39118</td><td>Atlanta, GA 30350</td></tr>
<tr><td>giskind@visalaw.com</td><td>ckuck@immigration.net</td></tr>
<tr><td>*Pro Hac Vice*</td><td>D.C. Bar ID: GA429940</td></tr>
<tr><td></td><td>Attorneys for Plaintiffs</td></tr>
</table>