**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUMANE SOCIETY OF NY, *et al.*, | Case No. 1:21-cv-01349-EGS |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR SUMMARY** |
| v. | **JUDGMENT** |
| ALEJANDRO MAYORKAS, *et al*., | |
| Defendants. | |

## <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Plaintiffs respectfully move the Court for summary judgment to set aside and vacate the Final Rule titled *Modification of Registration Requirement for Petitioners Seeking To File Cap-Subject H-1B Petitions*, 86 Fed. Reg. 1676 (Jan. 8, 2021) ("rule" or "Final Rule"). Unless set aside and vacated, the Final Rule will become effective on December 31, 2021.[1] *Modification of Registration Requirement for Petitioners Seeking To File Cap-Subject H-1B Petitions; Delay of Effective Date*, 86 Fed. Reg. 8543-01 (Feb. 21, 2021). The parties conferred and submitted a joint scheduling order, which the Court granted on September 15, 2021. *See* ECF No. 10, 12, 13. The motion and memorandum comply with the Court's scheduling order.

Dated: September 12, 2021                    Respectfully Submitted,

| | |
|---|---|
| __*/s/ Jeff Joseph*__<br>Jeff D. Joseph<br>Joseph & Hall P.C.<br>12203 East Second Avenue<br>Aurora, CO 80011<br>(303) 297-9171<br>jeff@immigrationissues.com<br>D.C. Bar ID: CO0084 | Jesse M. Bless<br>AMERICAN IMMIGRATION LAWYERS<br>ASSOCIATION<br>1331 G Street NW, Ste. 300<br>Washington, D.C. 20005<br>(781) 704-3897<br>jbless@aila.org<br>D.C. Bar ID: MA0020 |
| Greg Siskind<br>Siskind Susser PC<br>1028 Oakhaven Rd.<br>Memphis, TN 39118<br>giskind@visalaw.com<br>D.C. Bar ID: TN0021 | Charles H. Kuck<br>Kuck Baxter Immigration, LLC<br>365 Northridge Rd, Suite 300<br>Atlanta, GA 30350<br>ckuck@immigration.net<br>D.C. Bar ID: GA429940 |

---

[1] There is one other federal lawsuit challenging the Final Rule. *Chamber of Commerce of the United State of America et al v. United States Department of Homeland Security et. al*., Case No. 4:20-cv-07331-JSW (N.D. Cal.). A hearing on the parties' cross motions for summary judgment was heard on September 10, 2021, and on September 15, 2021, the Court enjoined the rule based solely on Chad Wolf lacking the authority to promulgate the Final Rule. *Chamber of Commerce v. DHS*, Slip Copy, 2021 WL 4198518 (N.D. Cal. Sept. 15, 2021).

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUMANE SOCIETY OF NY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, *et al*.,<br><br>Defendants. | Case No. 1:21-cv-01349-EGS<br><br>**PLAINTIFFS' MEMORANDUM OF FACTS AND LAW IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ...................................... 3

   A.  H-1B temporary worker Visas............................................................... 3

   B.  The H-1B Visa Registration and Selection Process ......................... 4

THE FINAL RULE................................................................................................ 7

ARGUMENT .......................................................................................................... 9

   A.  PLAINTIFFS HAVE STANDING ...................................................... 9

   B.  THE COURT SHOULD ENJOIN AND SET ASIDE FINAL RULE THAT
UNLAWFULLY SEEKS TO PRIORITIZE THE SELECTION OF H-1B PEITIONS
BASED ON WAGES................................................................................... 10

      1.  The Final Rule contravenes the plain language of the INA ...................... 10

      2.  Chad wolf lacked the authority to promulgate the Final Rule as acting secretary of
homeland security................................................................................................. 15

      3.  the Final Rule arbitrarily and capriciously failed to examine and meaningfully
respond to public comments ................................................................................. 19

   C.  PLAINTIFFS' HARMS WILL CONTINUE AT AN INCREASING RATE OF
CHANGE WITHOUT RELIEF ............................................................... 23

Conclusion ................................................................................................................ 26

Certificate of Service............................................................................................. 27

# **TABLE OF AUTHORITIES**

**Cases:**

*Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26 (D.D.C. 2010) ...................9

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) ...............................20

*Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125 (2011) ...................................................9

*Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117 (E.D.N.Y. 2020) .........................................................2

*Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) .....................................................................10

*Behring Regional Center v. Wolf*, Slip Op., 2021 WL 2554051 (N.D. Cal. 2021) ..................2,15

*Carlson v. Postal Reg. Comm'n*, 938 F.3d 337 (D.C. Cir. 2019) .................................................20

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020).............................................2

*Chamber of Commerce of US v. DHS*, Case No. 20-cv-07331-JSW (N.D. Cal Sept. 15, 2021).....1

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984) ...................................12

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134 (D.C. Cir. 2006)........15

*Cottage Health Ss. v. Sebelius*, 631 F. Supp. 2d 80 (D.D.C. 2009).................................................9

*DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891 (2020) .............................................................23

*E. Bay Sanctuary Covenant v. Barr*, --- F. Supp. 3d. ----, 2021 WL 607869 (N.D. Cal. Feb. 16, 2021). ...........................................................................................................................................2-3

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ........................................................23

*Env't Integrity Project v. McCarthy*, 139 F. Supp. 3d 25 (D.D.C. 2015)................................9, 10

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...........................................................23

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015)............................................9

*Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050 (D.C. Cir. 1986)......................................20

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020) ................................................................15, 20

*Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520 (N.D. Cal. 2020)....................................2

*Itech v. Renaud*, 5 F.4th 59 (D.C. Cir. 2021) ................................................................................11

*La Clinica de la Raza v. Trump*, No. 19-CV-04980-PJH, 2020 WL 7053313 (N.D. Cal. Nov. 25, 2020) .............................................................................................................................................2

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .............................................................................9

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994) ...........................................15

*Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996) ...............................10

*Niz-Chavez v. Garland*, ⸺ U.S. ⸺, 141 S. Ct. 1474 (2021) ..............................................11, 14

*Nw. Immigrant Rights Project v. USCIS*, 496 F. Supp. 3d 31 (D.D.C. 2020) ................................2

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) ....................................................................10

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-CV-09253-JD, 2021 WL 75756 (N.D. Cal. Jan. 8, 2021) ................................................................................................................2, 16, 18

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)....................................................................20

*Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017) .........................................10

*United States v. Larionoff*, 431 U.S. 864 (1977) .........................................................................11

*U.S. House of Representatives v. Mnuchin*, No. 19-5176, 2020 WL 5739026 (D.C. Cir. Sept. 25, 2020) .............................................................................................................................................9

*Walker Macy LLC v. USCIS*, 243 F. Supp. 3d 1156 (D. Or. 2017) .........................................12, 13

*Waterkeeper All. v. EPA*, 853 F.3d 527 (D.C. Cir. 2017)............................................................15

*Wis. Cent. Ltd. v. United States*, --- U.S. ---, 138 S. Ct. 2067 (2018)).  ...................................11

**Statutes and Regulations:**

5 U.S.C. § 3348(d)(1) ..............................................................................................................17, 19

5 U.S.C. § 553(c) ..................................................................................................................20

5 U.S.C. § 706..................................................................................................3, 11, 12, 15, 17

6 U.S.C. § 113(g)(2) ....................................................................................................18, 19

8 U.S.C. § 1101 ...................................................................................................................3

8 U.S.C. § 1101(a)(15)(H)(i)(b) .......................................................................................3

8 U.S.C. § 1103(a) ..............................................................................................................8

8 U.S.C. § 1182(n)(1) .........................................................................................................6

8 U.S.C. § 1184(a) ..............................................................................................................8

8 U.S.C. § 1184(g) ..............................................................1, 3, 4, 11, 12, 13, 14, 15

8 U.S.C. § 1184(i) ................................................................................................3, 14, 21

8 C.F.R. § 214.2(h)(2)(i)(I) ................................................................................................5

8 C.F.R. § 214.2(h)(8)(ii)(B) .............................................................................................5

8 C.F.R, § 214.2(h)(8)(iii) ..................................................................................................5

8 C.F.R. § 214.2(h)(8)(iii)(A) ............................................................................................6

8 C.F.R. § 214.2(h)(4) ........................................................................................................6

20 C.F.R. § 650.731(b)(3) .................................................................................................6

20 C.F.R. § 655.731(b)(3)(iii)(B) .....................................................................................6

20 C.F.R. § 655.731(b)(3)(iii)(C) .....................................................................................6

**Other Authorities:**

70 Fed. Reg. 23775 ...........................................................................................................5

73 Fed. Reg. 15389 ...........................................................................................................5

81 Fed. Reg. 90667 .........................................................................................................17

84 Fed. Reg. 888 ...........................................................................1, 4, 5, 7, 12, 13, 20

85 Fed. Reg. 59,651 ........................................................................................................18

85 Fed. Reg. 63875 ....................................................................................................7, 21

85 Fed. Reg. 69236 ..................................................................................................7, 8, 24

86 Fed. Reg. 1,676 ................................................................1, 6, 8, 12, 14, 16, 20, 22

Exec. Order No. 13,753 ................................................................................................17

Fed. R. Civ. P. 56(c) .......................................................................................................9

U.S. Const. art. III, §§ 1–2 .............................................................................................9

## INTRODUCTION

Plaintiffs consist of organizations and companies in the healthcare, public service, immigration, and technology-related sectors that employ foreign nationals throughout the United States. Plaintiffs have brought a meritorious challenge to the Department of Homeland Security's rule entitled *Modification of Registration Requirement for Petitioners Seeking to File Cap-Subject H-1B Petitions*, 86 Fed. Reg. 1,676 (Jan. 8, 2021) (Rule or Final Rule), which unlawfully prioritizes the selection of visa petitions based on wages. *See* 86 Fed. Reg. at 1,677.

The Final Rule is unlawful and must be set aside for three independent reasons. First, the prioritization of H-1B visas based on wages paid to the beneficiary of such temporary worker visas contravenes the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1184(g)(3), because the statute requires H-1B visas to "be issued . . . in the order in which petitions are filed for such visas." 8 U.S.C. § 1184(g)(3). Indeed, two years prior to the Final Rule, DHS reached the same conclusion and admitted that the prioritization of H-1B visas based on any single factors, including wages, would require a statutory change and could not be accomplished through rulemaking. *Registration Requirement for Petitioners Seeking to File H-1B Petitions on Behalf of Cap-Subject Aliens*, 84 Fed. Reg. 888, 914 (Jan. 31, 2019).

Second, the Rule must be set aside because Chad Wolf, who, along with his purported predecessor, never lawfully occupied the post of Acting Secretary of Homeland Security and lacked the authority to promulgate the rule. Indeed, as of September 15, 2021, Judge White in the Northern District of California enjoined this rule on basis of Chad Wolf's unlawful authority to promulgate it, though he declined to reach the statutory question. *See Chamber of Commerce of US v. DHS*, *Chamber of Commerce v. DHS*, Slip Copy, 2021 WL 4198518 (N.D. Cal. Sept. 15, 2021) (attached as Exhibit A to this filing). As of today, nine courts have universally set aside the actions taken based on the unlawful authority of the Acting Secretaries of DHS after the resignation

of Secretary Nielson. *See, e.g., Nw. Immigrant Rights Project v. USCIS*, 496 F. Supp. 3d 31, 55-70 (D.D.C. 2020); *Behring Regional Center v. Wolf*, Slip Op., 2021 WL 2554051 at *4-9 (N.D. Cal. 2021) ("This Court joins the numerous other courts which have held that because Secretary Nielsen amended the wrong Order of Succession when she purported to place the Customs and Border Protection Commissioner—Mr. McAleenan—third in line after the Deputy Secretary of Homeland Security and the Under Secretary of Management for succession to the Acting Secretary of Homeland Security position, Mr. McAleenan's appointment was invalid."); *La Clinica de la Raza v. Trump*, No. 19-CV-04980-PJH, 2020 WL 7053313, at *7 (N.D. Cal. Nov. 25, 2020) ("former Secretary Nielsen's April 9th order did not alter the Department's order of succession in cases of resignation and that Executive Order 13753 continued to govern the order of succession at the time of Secretary Nielsen's resignation."); *Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117, 132 (E.D.N.Y. 2020) ("Based on the plain text of the operative order of succession, neither Mr. McAleenan nor, in turn, Mr. Wolf, possessed statutory authority to serve as Acting Secretary."); *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 960 (D. Md. 2020), *appeal dismissed sub nom. Casa de Maryland, Inc. v. Mayorkas*, No. 20-2217, 2021 WL 1923045 (4th Cir. Mar. 23, 2021) ("McAleenan's appointment was invalid under the agency's applicable order of succession, and so he lacked the authority to amend the order of succession to ensure Wolf's installation as Acting Secretary."); *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-CV-09253-JD, 2021 WL 75756, at *5 (N.D. Cal. Jan. 8, 2021) ("Because the passing of the torch from Nielsen to McAleenan was ineffective, the attempt by McAleenan to pass it in turn to Wolf had no legal effect whatsoever. The entire succession argument under the HSA consequently falls apart."); *accord Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529-536 (N.D. Cal. 2020) (White, J.); *E.*

*Bay Sanctuary Covenant v. Barr*, --- F. Supp. 3d. ----, 2021 WL 607869, at *4 (N.D. Cal. Feb. 16, 2021).

Third, the Rule is arbitrary and capricious because the agency failed to meaningfully respond to the valid concerns and comments, including those submitted by the Plaintiffs, regarding the Rule's effects on early-career professionals in the medical, healthcare, and technology fields. Each one of these three reasons warrant vacatur of the rule under the Administrative Procedure Act ("INA") § 706.  Plaintiffs urge this Court to reach the statutory question and set aside this Rule, as the injunction from Judge White in the Northern District of California is based solely on Chad Wolf's lack of authority in promulgating it and there remains the possibility that the now-confirmed DHS Secretary, Alejandro Mayorkas may take measured to promulgate the same rule or take measures, including ratification, to cure Mr. Wolf's unlawful action..

## STATUTORY AND REGULATORY BACKGROUND

### A.  H-1B temporary worker Visas

The INA, 8 U.S.C. § 1101 *et seq*., authorizes U.S. employers to sponsor foreign workers for employment in United States in a variety of visa categories, including as nonimmigrants for temporary employment under the H-1B visa classification.  8 U.S.C. § 1101(a)(15)(H)(i)(b).  The H-1B visa program permits employers to temporarily employ foreign, nonimmigrant workers in specialty occupations.  *See* 8 U.S.C. § 1101(a)(15)(H). A specialty occupation is defined as an occupation that requires "theoretical and practical application of a body of highly specialized knowledge" and the occupation requires the "attainment of a bachelor's or higher degree in a specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States."  *Id*. § 1184(i)(1).

Congress has established limits on the number of foreign workers who may be granted initial H-1B nonimmigrant visas or status each fiscal year (FY) and the method how visas shall be

issued.  8 U.S.C. §§ 1184(g)(1), 1184(g)(3).  The total number of foreign temporary workers who may be granted initial H-1B nonimmigrant status during any fiscal year currently may not exceed 65,000.  8 U.S.C. § 1184(g).  The numerical limitation, referred to as the "H-1B cap," does not apply to H-1B petitions filed on behalf of certain individuals who have previously been counted against the cap.  8 U.S.C. § 1184(g)(7).  Certain petitions are exempt from the 65,000 numerical limitation, including H-1B workers who have earned a qualifying U.S. master's or higher degree. 8 U.S.C. §§ 1184(g)(5), (7).  Petitions for these "cap exempt" individuals may not exceed 20,000. 8 U.S.C. § 1184(g)(5)(C).  H-1B petitions for individuals who are employed or have received offers of employment at institutions of higher education, nonprofit entities related to or affiliated with institutions of higher education, or nonprofit research organizations or government research organizations, are also "cap exempt."  8 U.S.C. § 1184(g)(5).

## B. The H-1B Visa Registration and Selection Process

Section 1184(g)(3) of Title 8 provides that noncitizens seeking an H-1B cap visa "shall be issued . . . in the order in which petitions are filed for such visas or status."  8 U.S.C. § 1184(g)(3). The annual demand for H-1B visas almost always outstrips the annual supply.  For example, for FY2020, USCIS received 201,011 H-1B petitions during the filing period.  *USCIS Completes the H-1B Cap Random Selection Process for FY 2020 and Reaches the Advanced Degree Exemption Cap,* https://www.uscis.gov/news/alerts/uscis-completes-the-h-1b-cap-random-selection-process-for-fy-2020-and-reaches-the-advanced-degree (posted April 11, 2019, accessed March 18, 2021). Prior to 2019, USCIS monitored the number of H-1B cap-subject petitions received and notified the public of the date that USCIS received enough petitions needed to reach the numerical limit (the "final receipt date").  *Registration Requirement for Petitioners Seeking To File H–1B Petitions on Behalf of Cap-Subject Aliens*, 84 Fed. Reg. 888, 894 (Jan. 31, 2019).  USCIS then randomly selected from the cap-subject petitions received on the final receipt date from the projected number

of petitions needed to reach the limit.  *Id.*  Once the selection process for the 20,000 advanced

degree exemption was complete, USCIS then randomly selected petitions that apply to the

projections needed to reach the 65,000 regular cap limit.[2]  *Id.*

    In 2019, USCIS changed the registration process and introduced an electronic registration

process for employers who intend to participate in the H-1B program for that fiscal year.  84 Fed.

Reg. at 888-94, (codified at 8 C.F.R. § 214.2(h)(8)(iii)).  Prospective petitioners seeking to file H-

1B cap-subject petitions, including for beneficiaries eligible for the advanced degree exemption,

must first electronically register and then pay the associated nominal  $10 H-1B registration fee

for each beneficiary.   8   C.F.R.   §   214.2(h)(8)(iii)(A)(1);   84   Fed.   Reg.   at   919;

https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-

---

[2] In 2005, USCIS adopted rules changing its procedures for accepting and processing H–1B petitions. The new rules authorized, but did not require, the use of a random computer selection process. *See Allocation of Additional H–1B Visas Created by the H–1B Visa Reform Act of 2004*, 70 Fed. Reg. 23775, 23778, 23783 (May 5, 2005) (codified at former 8 C.F.R. § 214.2(h)(8)(ii)(B) (Jan. 1, 2006).  Under these procedures, USCIS estimated that it would need more than 85,000 petitions to fill the 85,000 slots available for each fiscal year.  USCIS monitored the number of petitions received and notified the public of the date that USCIS had received the necessary number of petitions (the "final receipt date"). Only applications received by the final receipt date were part of the random computer selection, and unless the final receipt date was the very first day that applications could be received, they allowed for applications on both the first and second days to be part of the random selection process. For the first time in FY2008 the limit was reached on the first day prompting USCIS to change the regulation.  *See Petitions Filed on Behalf of H–1B Temporary Workers Subject to or Exempt from the Annual Numerical Limitation*, 73 Fed. Reg. 15389 (Mar. 24, 2008) (codified at 8 C.F.R. § 214.2(h)(8)(ii)(B)).  USCIS found that stopping consideration of petitions received after the final receipt date caused employers to spend significant effort and money to send petitions by overnight delivery for receipt by USCIS on the first allowable date.  *Id.* at 15,391. This also caused problems for overnight delivery carriers and for USCIS offices receiving petitions. *Id*.  To better manage the process, USCIS began to include all petitions received within the first five business days as part of the computer selection process. *Id*. at 15,392. After that five-day period, cases were selected randomly, and the first 65,000 applications were selected for processing.  The fiscal year for Congress begins on October 1st of every year and that is the date on which the 65,000 visas are allocated and available to new H-1B petitioners. However, employers can file for those 65,000 visas as early as six months ahead of the actual date of need (e.g., October 1st which is also commonly referred to as the employment start date).  *See* 8 CFR 214.2(h)(2)(i)(I).

occupations-and-fashion-models/h-1b-electronic-registration-process.    The initial registration period remains for a minimum of 14 calendar days beginning in March.  8 C.F.R. §§ 214.2(h)(8)(iii)(A)(2)-(4). Randomized selections of registrants then take place after the close of the initial registration period.  8 C.F.R. § 214.2(h)(8)(iii)(A)(5).  Under the current selection process, "USCIS monitors the number of H-1B registrations it receives during the announced registration period and, at the conclusion of that period, if more registrations are submitted than projected as needed to reach the numerical allocations, randomly selects from among properly submitted registrations the number of registrations projected as needed to reach the H-1B numerical allocations."  86 Fed. Reg. at 1678.  "USCIS first selects registrations submitted on behalf of all beneficiaries, including those eligible for the advanced degree exemption. USCIS then selects from the remaining registrations a sufficient number projected as needed to reach the advanced degree exemption."  *Id*.  Only those with selected registrations may proceed to file H-1B cap-subject petitions for eligible workers.[3]  *Id*.

---

[3] Employers complete a two-step process with respect to each selected, eligible foreign worker.  First, employers must submit a Labor Condition Application ("LCA") to the Department of Labor ("DOL") identifying the specialty occupation position at issue and confirming that they will comply with the requirements of the program.  *See* 8 U.S.C. § 1182(n)(1); 8 C.F.R. § 214.2(h)(4).  On an LCA, an employer must provide the Standard Occupational Classification (SOC) code and area(s) of intended employment, the wage that an employer will pay the nonimmigrant worker, the prevailing wage rate for the job opportunity, and the source of the prevailing wage rate, including the applicable prevailing wage level for the job opportunity if the Occupational Employment Statistics ("OES") is used to determine the prevailing wage level.  20 C.F.R. § 650.731(b)(3).  An employer may base the prevailing wage on one of the following sources: a current wage as determined under the Davis-Bacon Act or the McNamara-O'Hara Service Contract Act; an independent authoritative source that satisfies the requirements in 20 C.F.R. § 655.731(b)(3)(iii)(B); or another legitimate source of wage data that satisfies the requirements in 20 C.F.R. § 655.731(b)(3)(iii)(C), including the DOL's National Prevailing Wage Center that will derive the appropriate prevailing wage from the Bureau of Labor Statistics Occupational Employment Statistics ('OES') Survey" https://www.dol.gov/agencies/eta/foreign-labor/wages/prevailing-wage.  DOL uses four wage levels, I, II, III, and IV, with the salaries increasing upward at each level, which DOL categorizes as "entry," "qualified," "experienced," and "fully competent," respectively, relative to the occupation.

In January 2019, USCIS remained firm in its understanding that "the registration process [i]s an antecedent procedural requirement that must be met before a petition is deemed to be properly filed." *Registration Requirement for Petitioners Seeking To File H–1B Petitions on Behalf of Cap Subject Aliens*, 84 Fed. Reg. 888, 896 (Jan. 31, 2019). Consistent with this approach, USCIS recognized that ranking and prioritizing H-1B cap registrations on factors other than degree level, such as wage levels, required a legislative change. 84 Fed. Reg. at 913. Specifically, the agency stated in response to comments advocating for the prioritization of visas based on factors, such as wage levels as follows:

> DHS believes that reversing the cap selection order to prioritize beneficiaries with a master's or higher degree from a U.S. institution of higher education is a permissible interpretation of the existing statute, as explained in detail in response to other comments in this preamble. **DHS believes, however, that prioritization of selection on other bases such as those suggested by the commenters [such as wages or salary] would require statutory changes**.

*Id*. (bracketed language and emphasis added).

### THE FINAL RULE

Eleventh months later, and without any rational explanation, USCIS reversed its position and published a notice of proposed rulemaking to prioritize the selection of H-1B visa petitions based on wage levels. *Modification of Registration Requirement for Petitioners Seeking To File Cap-Subject H-1B Petitions*, 85 Fed. Reg. 69236 (Nov. 2, 2020). Under the rule, USCIS "will rank and select the registrations received generally based on the highest OES wage level that the proffered wage equals or exceeds for the relevant SOC code in the area of intended employment,

---

https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/NPWHC_Guidance_Revised_11_2009.pdf
    DOL continues to determine the four wage rates based on the 17th percentile, the 34th percentile, the 50th percentile, and the 67th percentile, respectively, of the OES reported wage distribution for each occupation. 85 Fed. Reg. at 63,875. *ETA Prevailing Wage Determination Policy Guidance, Nonagricultural Immigration Programs 7* (May 2005), available at https://www.foreignlaborcert.doleta.gov/pdf/policy_nonag_progs.pdf.

beginning with OES wage level IV and proceeding in descending order with OES wage levels III, II, and I.  86 Fed. Reg. at 1677.  USCIS now claims that "the statute is silent as to how USCIS must select H-1B petitions and it had the discretion to prioritize the issuance of visas based on wages "relying on its general statutory authority to implement the statute and proposes to revise the regulations to design a selection system that realistically, effectively, efficiently, and more faithfully administers the cap selection process."  86 Fed. Reg. at 1695, *citing* 8 U.S.C. §§ 1103(a), 1184(a) and (c)(1) (emphasis added).

"DHS received 1103 comments during the 30-day public comment period, and 388 comments on the rule's information collection requirements before the comment period ended." 86 Fed. Reg. at 1678.  Despite the overwhelming opposition of commenters, DHS held steadfast to its decision to prioritize the selection of H-1B petitions based on wage levels, starting with the highest wage level, and moving downward until reaching the statutory limit.  86 Fed. Reg. at 1676. The agency predicts no individuals paid Level I wages will be selected under the prioritization selection process, notwithstanding that those excluded individuals meet the statutory and regulatory requirements for an H-1B visa.  85 Fed. Reg. at 69253. Approximately 14% of H-1Bs are selected at the Level 1 wage under the process now in effect.  Daniel Costa & Ron Hira, *H-1B vias and Prevailing wage levels*, ECONOMIC POLICY INSTITUTE, May 2, 2020, available at, https://www.epi.org/publication/h-1b-visas-and-prevailing-wage-levels/.   On the other hand, Defendants expect all individuals paid at a Level III and Level IV level will be selected, and perhaps 75% of Level II wage workers as well.  *Id.*

The Lottery Rule was signed by Ian J. Brekke, "the Senior Official Performing the Duties of the General Counsel for DHS," pursuant to a delegation of authority from Chad Wolf, who at the time was purporting to be the Acting Secretary of Homeland Security.  *See* 86 Fed. Reg. at

1,732 ("The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, is delegating the authority to electronically sign this document to Ian J. Brekke, who is the Senior Official Performing the Duties of the General Counsel for DHS, for purposes of publication in the Federal Register.").

## ARGUMENT

Summary judgment is appropriate because the material facts are not in dispute and the record provides a sufficient basis for the Court to award relief to Plaintiffs under the APA. Fed. R. Civ. P. 56(c); *Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31-32 (D.D.C. 2010), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011). In cases arising under the APA summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Cottage Health Ss. v. Sebelius*, 631 F. Supp. 2d 80, 90 (D.D.C. 2009) (citation omitted).

### A.    PLAINTIFFS HAVE STANDING

At least one plaintiff must prevail on the question of standing to prevail on the merits of an injunction. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015); see *also U.S. House of Representatives v. Mnuchin*, No. 19-5176, 2020 WL 5739026, at *3 (D.C. Cir. Sept. 25, 2020). Article III of the Constitution limits "[t]he judicial power of the United States" to "Cases" and "Controversies." U.S. Const. art. III, §§ 1–2. "To state a case or controversy under Article III, a plaintiff must establish standing," *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011), "the 'irreducible constitutional minimum' of" which requires "'the plaintiff [to] have suffered an injury in fact'" that has a "'causal connection'" to "the challenged conduct," and that can be "be 'redressed by a favorable decision,'" *Env't Integrity Project v. McCarthy*, 139 F. Supp. 3d 25, 36 (D.D.C. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)). When the plaintiff is an organization, as particular plaintiffs are in this matter, the organization may assert

standing on its own behalf ("organizational standing") "or on behalf of [its] members ('associational standing')." *McCarthy*, 139 F. Supp. 3d at 36; see also *O.A. v. Trump*, 404 F. Supp. 3d 109, 142 (D.D.C. 2019). If one plaintiff establishes standing, the Court "'need not consider the standing of the other plaintiffs to raise that claim.'" *Bauer v. DeVos*, 325 F. Supp. 3d 74, 88 (D.D.C. 2018) (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)); *see also Town of Chester, N.Y. v. Laroe Estates, Inc*., 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").

The attached declarations from Plaintiffs establish standing. *See* Exhibit B (Declaration of Jason D. Oxman, President and Chief Executive Officer of the Information Technology Industry Council (ITI); Declaration of Dr. Ram Sanjeev Alur, MD, president of Physicians for American Healthcare Access (PAHA); Declaration of Jaspreet Kaur Gill, DDS, President of Dentists For America, LLC; Ms. Sandra DeFeo, Executive Director/Director of Public Relations of the Humane Society of New York). Each plaintiff either regularly employs or represents the interests of noncitizens through the H-1B process at the entry or Level 1 wage level. Oxman Decl. ¶¶ 1-5. Alur Decl. ¶ 1. Gil Decl. ¶¶ 2-4; DeFeo Decl. ¶¶ 4-9. Under the new rule, Plaintiffs will suffer from the final rule's unlawful exclusion of highly skilled workers notwithstanding their eligibility for H-1B visas. Oxman Decl. ¶¶ 18-22; Alur Decl. ¶¶ 14-18; Gil Decl. ¶¶ 9-15; Defeo Decl. ¶¶ 4-9. ITI explicitly expressed how the prioritization would harm their ability to employ H-1B workers and urged the agency not to pursue an abbreviated, procedurally flawed comment period. Oxman ¶¶ 7-19. Vacatur of the rule would redress the on-going and increasing harms to Plaintiffs.

## B. THE COURT SHOULD ENJOIN AND SET ASIDE FINAL RULE THAT UNLAWFULLY SEEKS TO PRIORITIZE THE SELECTION OF H-1B PEITIONS BASED ON WAGES

### 1. THE FINAL RULE CONTRAVENES THE PLAIN LANGUAGE OF THE INA

The Final Rule is not in accordance with the INA and should be set aside.  The APA §

706 provides, in relevant part, that the reviewing court shall--

> (2) hold unlawful and set aside agency action, findings, and
> conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in
> accordance with law;
> ...
> (C) in excess of statutory jurisdiction, authority, or limitations, or
> short of statutory right;
>
> (D) without observance of procedure required by law; ....

5.U.S.C. § 706(2).

While Plaintiffs acknowledge the Rule has been enjoined in the Northern District of

California, this injunction is based solely on Chad Wolf's unlawful appointment, and thus is still

subject to ratification by the now Senate confirmed DHS Secretary, Alejandro Mayorkas.

Plaintiffs urge this Court to reach the statutory question, and enjoin the Rule in its entirety as

unlawful, violative of the APA, and not in accordance with the INA.

Regulations "must be consistent with the statute under which they are promulgated."

*United States v. Larionoff*, 431 U.S. 864, 873 (1977).  When called on to resolve a dispute over a

statute's meaning, courts "afford the law's terms their ordinary meaning at the time Congress

adopted them."  *Niz-Chavez v. Garland*, —— U.S. ——, 141 S. Ct. 1474, 1480 (2021).  Courts

must first exhaust "all the textual and structural clues" as to uncover Congress's intended meaning.

*Id*. (*quoting Wis. Cent. Ltd. v. United States*, --- U.S. ---, 138 S. Ct. 2067, 2074 (2018)).

"No statutory gymnastics are necessary here" *see Itech v. Renaud*, 5 F.4th 59, 66 (D.C. Cir.

2021), because selecting H-1B visas based on wages is inconsistent with the plain language of 8

U.S.C. § 1184(g)(3).  The INA, 8 U.S.C. § 1184(g), provides the numerical limitations and method

11

for issuance of H-1B visas each fiscal year.  *See id.* ("Temporary workers and trainees; limitation on numbers").  Under subsection (g)(3), cap-subject noncitizens seeking an H-1B visa:

> **shall be issued visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas**.

8 U.S.C. § 1184(g)(3) (emphasis added).  In January 2019, DHS concluded in its amendment to the registration process that "prioritization of [H-1B visa] selection on other factors," that is selection other than the receipt of petitions in the order filed, "would require statutory changes." 84 Fed. Reg. at 914.  Despite this prior concession and commitment to work within the confines of the statute, the Final Rule seeks to prioritize the selection of H-1B petitions based on wages paid to temporary workers.  86 Fed. Reg. at 1677;  *id*. at 1732-33 (amended text of 8 C.F.R.§§ 214.2(h)(8)(iii)(A)(5)-(6)).  Defendants have now done what it knows it cannot.   This reversal of policy is arbitrary and capricious and not in accordance with law.  5 U.S.C. § 706(2)(A).

The agency's unexplained change in position and attempt to offer the plain text of 8 U.S.C. § 1184(g)(3) as ambiguous lacks merit.  86 Fed. Reg. at 1694-95 & nn. 68-73, *citing Walker Macy LLC v. USCIS*, 243 F. Supp. 3d 1156 (D. Or. 2017).  The standard of review for agency deference to rulemaking is governed by the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 104 S. Ct. 2778 (1984). Under the familiar *Chevron* framework, a court first asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43; *see also id*. at 843 n. 9.  DHS' claim of deference contradicts both its own prior position and the plain language of statute, and thus fails at *Chevron* step 1.

In *Walker Macy*, the principal decision the DHS relies on for its claim to deference, the Court considered whether the agency's randomized computer selection process for petitions

received simultaneously was a reasonable implementation of the statute.  243 F. Supp. 3d at 1175.

In upholding the random selection process, the Court concluded that the agency reached a

reasonable position that petitions "are not 'filed' for purposes of 1184(g) until after the USCIS

employee has taken them out of the envelope and assigned them a number in order to get

processed." *Walker Macy*, 243 F. Supp.3d at 1174.  The Court ruled that the addition of "a random

computer selection … to eliminate concerns of arbitrariness in delivery times and simultaneous

delivery is not unreasonable or contrary to the statute." *Id*.

DHS previously recognized the difference between a uniform process to collect

registrations and the second procedural step of selecting among the chosen visas for filing when it

adopted its current electronic registration process.  In 2019, DHS stated that "the registration

process "[i]s an antecedent procedural requirement that must be met before a petition is deemed to

be properly filed."  84 Fed. Reg. at 896.  DHS' prior interpretation is consistent with the statute

and its one-hundred-and eighty degree change of position finds no support in the statute.

Here, the agency has deliberately recreated the selection process of visas so that it selects

those with the highest wages first after the antecedent registration process, the randomized first

step considered and upheld in *Walker Macy*.  Unlike the rule to collect registered visa petitions,

the statute is neither silent nor ambiguous with respect to the process following collection, that is,

the selection for issuance of visas to noncitizens: visas "shall" be selected in the order filed.  8

U.S.C. § 1184(g)(3).  Unlike the choice to alleviate administrative burdens to *ensure* petitions

received simultaneously are *randomly* selected from the pool considered in *Walker Macy*, the Final

Rule here fundamentally reshapes who will ultimately be selected through the creation of a priority

selection process based on a single factor, wages of the temporary worker, to ensure that visa

petitions are *not* selected in the order filed.  The Final Rule cannot be squared with the plain, unambiguous language of 8 U.S.C. § 1184(g)(3), and therefore must be set aside.

Because the Court can easily discern Congressional intent from the statute's plain language, the Court's APA review terminates at step 1 of the *Chevron* review and the Agency's construction is owed no deference. *Chevron*, 467 U.S. at 842-43. The Court must reject any effort to rationalize the agency's new reading of the 8 U.S.C. § 1184(g)(3) to adopt a wage-based selection process to "implement the statute more faithfully to its dominant legislative purpose" 86 Fed. Reg. at 1697.

While the allocation of H-1B visas seek to address labor shortages in positions requiring highly skilled or highly educated workers, *see id.*, the agency's assumption that *highly skilled* and *highly educated* workers necessarily equate to higher salaried workers is unsupported and facially dubious.  More importantly, this question remains for Congress to answer, and the statutory criterion it has chosen for such workers never mentions wages as a basis for selection among positions for "specialty occupations;" Congress  has chosen to allocate visas "in specialty occupations" for all positions requiring "a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." 8 U.S.C. § 1184(i).  Prospective wages are not a factor Congress endorsed to differentiate among employers seeking to fill positions in "specialty occupations." *Id*.

In sum, the statute is not silent on the selection of visas – they must be selected in the order filed – and not based on a factor that provides priority to visas out of order -- and "no amount of policy talk can overcome the plain statutory command." *Niz Chavez*, 141 S. Ct. at 1486. "The Supreme Court and this [circuit] have consistently reminded agencies that they are 'bound, not

only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Gresham v. Azar*, 950 F.3d 93, 101 (D.C. Cir. 2020), *quoting MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994); *see also Waterkeeper All. v. EPA*, 853 F.3d 527, 535 (D.C. Cir. 2017); *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139–40 (D.C. Cir. 2006). Because the Final Rule would rewrite the statutory command to select visas "in the order in which petitions are filed," *see* 8 U.S.C. § 1184(g)(3), it is not in accordance with law and must be set aside.

### 2.  CHAD WOLF LACKED THE AUTHORITY TO PROMULGATE THE FINAL RULE AS ACTING SECRETARY OF HOMELAND SECURITY

The Final Rule was promulgated "in excess of statutory authority" because Former Acting Homeland Security Secretary Chad Wolf was not properly serving in his position when he promulgated the Final Rule. *See* 5 U.S.C. §§ 706(2)(A), 706(2)(C), 706(2)(D). This is not a novel legal issue as numerous courts and the Government Accountability Office[4] have unanimously held that Secretary Nielsen amended the wrong Order of Succession at the time of her resignation, unlawfully placed Mr. Kevin McAleenan in the position of the Acting Secretary of Homeland Security, and Mr. McAleenan's attempt to pass the torch to Mr. Wolf failed. *Behring Regional Center*, 2021 WL 2554051 at *4-5 (collecting cases). He had no authority to promulgate the Final Rule. *Id*. Indeed, in the Northern District of California, the Rule at issue in the present case was enjoined based solely on this exact issue. *See* Exhibit A, Order Granting Plaintiffs' Motion for

---

[4] GAO, Homeland Security, https://www.gao.gov/assets/710/708830.pdf., File B-331650, (Aug. 14, 2020) (although "Mr. McAleenan assumed the title of Acting Secretary upon the resignation of Secretary Nielsen, [ ] the express terms of the existing designation required another official to assume that title. As such, Mr. McAleenan did not have the authority to amend the Secretary's existing designation.") *Id*. at 10.

Summary Judgment, , *Chamber of Commerce v. DHS*, Slip Copy, 2021 WL 4198518 (N.D. Cal. Sept. 15, 2021).

In delaying the effective date of the Final Rule, DHS dismissed the unanimous district court decisions ruling that the agency lacked an Acting Secretary for almost two years and specifically that Mr. Wolf and Mr. Ian Brekke as Chief Counsel had no authority promulgate and sign the Final Rule stating in a footnote as follows:

> The H-1B Selection Final Rule was approved by Chad F. Wolf in his capacity as Acting Secretary of Homeland Security. DHS is aware that multiple courts have indicated or held that Mr. Wolf did not have valid authority to act, and, therefore, did not have authority to sign rules in that capacity. DHS also is aware that, following issuance of the rule, Peter T. Gaynor and Mr. Wolf took steps to ratify the H-1B Selection Final Rule. See DHS Delegation No. 23028, Delegation to the Under Secretary for Strategy, Policy, and Plans to Act on Final Rules, Regulations, and Other Matters (Jan. 12, 2021); Chad F. Wolf, Ratification (Jan. 14, 2021). **By issuing this rule, DHS states no position on Mr. Gaynor's or Mr. Wolf's actions or authority.**

86 Fed. Reg. at 8543 n.1 (emphasis added).

Assuming *arguendo* that Defendants have now adopted the position that Mr. Wolf lawfully promulgated the Final Rule and endorsed it, the Court should reject the attempt of Defendants to relitigate the issue. *Pangea*, 2021 WL 75756 at *4 ("A good argument might be made that . . . the government's arguments lack a good-faith basis in law or fact."). Moreover, any theory that Mr. Gaynor and Mr. Wolf took sufficient steps to ratify the H-1B Selection Final Rule, *See DHS Delegation No. 23028, Delegation to the Under Secretary for Strategy, Policy, and Plans to Act on Final Rules, Regulations, and Other Matters* (Jan. 12, 2021); Chad F. Wolf, Ratification (Jan. 14, 2021), would be surprising since counsel for the Department of Justice abandoned this theory on this very issue. *Pangea*, 2021 WL 75756 at *5 ("counsel for the government abandoned this [Gaynor and Wolf ratification] theory at the hearing. In response to a direct question by the Court,

counsel stated that Gaynor 'never' was the Acting Secretary of Homeland Security … Because Gaynor was never the Acting Secretary, he did not have the authority under the FVRA or EO13753 to change the order of succession at DHS.  It follows that Gaynor could not have designated Wolf to be acting Secretary, and that Wolf's effort to ratify his June 2020 actions as Acting Secretary is of no moment legally."). Because Mr. Wolf lacked the authority to promulgate the Final Rule, it "ha[s] no force or effect," 5 U.S.C. § 3348(d)(1), and must be "set aside" as action taken "in excess of statutory. . . authority."  5 U.S.C. § 706.

      *a.  Secretary Nielsen's Unlawfully Appointed Kevin McAleenan as Acting DHS Secretary*

Until the confirmation of DHS Secretary Alejandro Mayorkas on February 2, 2021, there had not been a Senate-confirmed DHS Secretary since the departure of former Secretary Kirstjen Nielsen on April 10, 2019.  At the time of Secretary Nielsen's resignation, DHS had two different orders of succession, one of which was applicable to any vacancy caused by a resignation and another to any vacancy caused by an emergency.  *See DHS Delegation* No. 106 (Revision No. 08.5), *DHS Orders of Succession and Delegations of Authority* (Apr. 10, 2019); Exec. Order No. 13,753, 81 Fed. Reg. 90,667 (Dec. 9, 2016).  Prior to her resignation, Secretary Nielsen designated the Customs and Border Protection Commissioner, who at that time was Mr. Kevin McAleenan, as the next in line to serve as Acting Secretary in the event of an emergency, but not in the event of her resignation.  *Id*.  Upon Secretary Nielsen's resignation, Mr. McAleenan incorrectly assumed the role of Acting Secretary.  *Id.*

      *b.  Mr. McAleenan Could Not Pass The Torch to Chad Wolf*

Mr. Christopher Krebs, then the Director of the Cybersecurity and Infrastructure Security Agency (formerly known as Under Secretary for National Protection and Programs), should have assumed the role of the Acting Secretary.  *Id*.  On November 8, 2019, the 212th day after Secretary

Nielsen resigned, Mr. McAleenan attempted to revise DHS Delegation 106 to consolidate the emergency and resignation orders of succession under the HSA, 6 U.S.C. § 113(g)(2). *DHS Delegation No. 106, Revision No. 8.6, DHS Orders of Succession and Delegations of Authority* (Nov. 8, 2019) ("November Delegation"). The November Delegation elevated Under Secretary for Strategy, Policy, and Plans as the "first assistant" successor. *Id*. At this time, Mr. Wolf served as the Under Secretary for Strategy, Policy, and Plans. The November Delegation was a nullity, however, because Mr. McAleenan was not lawfully serving as Acting Secretary. The Homeland Security Act ("HSA") restricts the authority to change the order of succession to a Senate-confirmed DHS Secretary. *See* 6 U.S.C. § 113(g)(2). Even if Secretary Nielsen had correctly placed Mr. McAleenan in line to serve as the Acting Secretary, he could not make further changes to the order of succession because he only held an "Acting" position. *Id*. Accordingly, Mr. Wolf incorrectly assumed the role of Acting DHS Secretary from Acting Secretary Mr. McAleenan who was also serving unlawfully. *Id.*

According to a memorandum issued by Mr. Wolf, if Mr. McAleenan's November Delegation had been invalid, Peter Gaynor, the Administrator of the Federal Emergency Management Agency ("FEMA") would have become Acting DHS Secretary by operation of law. 85 Fed. Reg. 59,651, 59,653 (Sept. 23, 2020). However, Mr. Gaynor borrowed the same flawed playbook to re-install Mr. Wolf to the position of Acting Secretary. *See* Peter T. Gaynor*, Order Designating the Order of Succession for the Secretary of Homeland Security* (Nov. 14, 2020). Following Mr. Gaynor's Delegation Memos, Mr. Wolf attempted to ratify all past actions taken during his and Mr. McAleenan's unlawful tenures. As counsel for the DHS has conceded, however, Mr. Gaynor lacked the authority to change the order of succession because only a Senate-confirmed Secretary of Homeland Security had such authority. *Pangea*, 2021 WL 75756 at \*5.

Mr. Gaynor never properly assumed the role of Acting Secretary just like Mr. Wolf and Mr. McAleenan before him.  Mr. Gaynor was never sworn in, and DHS never submitted any notice to Congress that he was serving as Acting Secretary, as it has done for past Acting Secretaries.  Nor did Mr. Gaynor resign as FEMA Administrator or otherwise create a new vacancy upon purporting to assume the role of Acting Secretary.

<em>c.   The Repeated Ratification Attempts Failed</em>

Mr. Wolf was never lawfully designated to serve as Acting Secretary pursuant to 6 U.S.C. § 113(g)(2), and never lawfully held the authority assigned to an Acting DHS Secretary.  Even if he did assume the role of Acting Secretary, Mr. Wolf could not lawfully ratify prior actions that had no force or effect under the Federal Vacancies Reform Act ("FVRA"), and he had no independent, rational basis to properly ratification of his own misdeeds. 5 U.S.C. § 3348(d)(2). Mr. Wolf's repeated ratification attempts of his unlawful policies remain improper and unlawful. Indeed, the FVRA precluded the parade of ratification attempts by Mr. Wolf and Mr. Gaynor. *See* 5 U.S.C § 3348(d)(2).  This Court should dismiss any attempt by the government to relitigate the unlawful promulgation of the Final Rule and set it aside.

### 3.   THE FINAL RULE ARBITRARILY AND CAPRICIOUSLY FAILED TO EXAMINE AND MEANINGFULLY RESPOND TO PUBLIC COMMENTS

As a final alternative, the Final Rule is invalid because Defendants arbitrarily and capriciously failed to examine and meaningfully respond to public comments.  Under the APA, "[a]n agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see* 5 U.S.C. § 553(c) (agency must "consider[] . . . the relevant matter presented" in comments).  While "[a]n agency need not discuss every item of fact or opinion included in the submissions made to it," the agency "must respond to comments that can be thought to challenge a fundamental premise underlying

19

the proposed agency decision." *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quotation marks omitted).

In January 2019, USCIS publicly recognized that ranking and prioritizing H-1B cap registrations on factors other than degree level, such as wages, required a legislative change.  84 Fed. Reg. at 913.  "DHS received 1103 comments during the 30-day public comment period, and 388 comments on the rule's information collection requirements before the comment period ended."  86 Fed. Reg. at 1678.  Despite the overwhelming opposition of commenters, the Final Rule held steadfast to selections for the H-1B program based on wage levels, starting with the highest wage level, and moving downward until reaching the statutory limit.  86 Fed. Reg. at 1676. Defendants do not rationally discuss its dramatic change in its plain reading of the INA.  The public has been left to wonder how the plain language went so suddenly silent.  The APA demands more. *Gresham*, 950 F.3d at 103 ("Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."), *citing Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (critiquing an agency for "brush[ing] aside critical facts" and not "adequately analyz[ing]" the consequences of a decision); *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) (analyzing whether an agency actually considered a concern rather than merely stating that it considered the concern).

DHS also failed to meaningfully consider the comments and impact of the Final Rule. Defendants predict that zero individuals paid Level I wages will be selected for an H-1B visa. 85 Fed. Reg. at 692253.   Approximately 14% of H-1Bs are selected at the Level 1 wage under the process now in effect.  Daniel Costa & Ron Hira, *H-1B vias and Prevailing wage levels*, ECONOMIC POLICY INSTITUTE, May 2, 2020, available at https://www.epi.org/publication/h-1b-visas-and-

prevailing-wage-levels/.[5]  Through the wage dependent selection process, USCIS admittedly seeks to "maximize H-1B cap allocations, so that *they more likely will go to the best and brightest workers*; and it will disincentivize abuse of the H-1B program to fill relatively lower-paid, *lower-skilled positions*, which is a significant problem under the present selection system."  86 Fed. Reg. at 1677 (emphasis added).  Defendants offer no rational explanation how wages alone accurately reflect "the best and brightest workers."  *Id*.  Nor do they meaningfully and rationally explain their conclusory statement that workers paid at wage levels I or II are "lower-skilled" positions.  86 Fed. Reg. at 1677.  On the contrary, by definition, the H-1B is designed specifically for highly skilled "specialty occupation" workers, regardless of compensation.  8 U.S.C. § 1184(i), even at a level I wage.  The Final Rule arbitrarily and capriciously associates wages with marketplace and economic value and thus is procedurally flawed.  Its exclusion of entry level noncitizens who meet the statutory criteria for H-1B visas is arbitrary, capricious, and not in accordance with law.

DHS offered no rational response to the valid argument that the Final Rule will supersede the eligibility criteria for H-1B nonimmigrants that does not prioritize wages as a factor to determine who qualifies to work in a "specialty occupation."  8 U.S.C. § 1184(i).  The practical effect of the rule will overwrite the multi-factor statutory and regulatory model for H-1B cap numbers as well as petitions because it would exclude qualifying workers in specialty occupations that offer different wages than other specialty occupations.  Non-profits such as the Humane Society of NY, start-ups, and rurally located and small businesses and medical clinics will be completely shut out of the H-1B program, including plaintiffs like PAHA, Dentists for America and the Humane Society of New York.  Alur Decl. ¶¶ 17-18; Gil Decl. ¶¶ 14-16.  On an individual

---

[5] Defendants concede that all individuals paid at a Level III and Level IV level would be selected, and perhaps 75% of Level II wage workers as well.  *Id*.

level, recent college graduates will also be shut out of the program as H-1Bs will only go to workers who have significant work experience that would justify a Level IV wage. The Final Rule arbitrarily, capriciously, and unlawfully equates salary with value and makes the H-1B cap program dependent on a single factor.

DHS only offered a bare bones denial of the concerns raised regarding its regime change to prioritizing relatively higher-paid noncitizens that would effectively displace early-career professionals and made no effort to respond to many of the thoughtful comments and concerns, including the comment submitted by Plaintiff ITI. Oxman Decl. ¶¶ 8-16. The agency simply dismissed the comment and expressed its "disagree[ment] with the assertions that this rule will either preclude or essentially preclude H-1B status for recent graduates, entry-level foreign workers, and young alien professionals," and provided a cursory restatement of its new wage-based selection process that does not completely shut out entry-level workers so long as "an employer chooses to offer a recent foreign graduate a wage that equals or exceeds a particular wage level," does not constitute a meaningful response. 86 Fed. Reg. at 1682. The agency glossed over the data and evidence showing that entry-level professionals generally command lower salaries and wages do not dictate what positions qualify as "specialty occupations," and thus the Rule would effectively close the door to many highly skilled workers who meet the statutory and regulatory criteria for a H-1B visa based on wages alone. The agency provided no meaningful response on this score and there is none. "When an agency changes course, as DHS did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.' 'It would be arbitrary and capricious to ignore such matters.'" *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (citation omitted) (first quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016), then quoting *FCC v. Fox Television*

22

*Stations, Inc.*, 556 U.S. 502, 515 (2009)). DHS nonetheless did just that. As a result, the Lottery Rule is arbitrary and capricious for at least two additional reasons: failure to respond to these further comments, and failure to take these deep reliance interests into account before changing the selection criteria to de-prioritize early-career professionals. For these independent reasons as well, the Lottery Rule must be set aside—even apart from its unmistakable facial illegality and Chad Wolf's widely acknowledged lack of authority.

### C.    PLAINTIFFS' HARMS WILL CONTINUE AT AN INCREASING RATE OF CHANGE WITHOUT RELIEF

The procedural errors and unlawful promulgation of the Final Rule, standing alone, warrant relief in favor of Plaintiffs. *See* Oxman Decl. ¶¶ 8-16. DHS arbitrarily failed to respond or even acknowledge the comment and concerns of ITI who carefully and thoroughly "explained the unlawful aspects of the rule and the devastating impact that prioritizing H-1B visas by wage levels would have on our organization." Oxman Decl. ¶¶ 8-11. ITI represents 80 member organizations that make up many of America's leading companies. *Id*. at ¶ 4. In its comment, ITI notified the agency that the Final Rule would harm "'ITI members [who] will not have the capacity to hire workers from abroad' leading many available jobs to go unfilled thereby stifling economic growth and negatively impacting job growth for foreign nationals and American workers." *Id.* ¶ 12. ITI further asserted that the abbreviated 30-day comment period combined with the lack of disclosed data from USCIS harmed "our members' and ITI's ability to properly assess the impact of the rule and adequately represent the interests of constituents." *Id*. ¶ 13. Defendants "flatly rejected [ITI's] correct assessment of the ultra vires rule and did not address our specific comment. *Id.* ¶ 16. The procedural flaws of the agency warrant summary judgment in favor of plaintiffs. *Regents*, 140 S. Ct. at 1913

In addition to the procedural violations of the APA, Plaintiffs have demonstrated that the Final Rule would exclude eligible highly skilled workers from the H-1B program. Oxman Decl. ¶¶ 22-23; Alur Decl. ¶¶ 17-18; Gil Decl. ¶¶ 14-16; Defeo Decl. ¶¶ 4-9. Defendants do not dispute that the Final Rule will extinguish access to the H-1B program for early-career professionals, including those who have completed an undergraduate, graduate, and professional or doctoral degree at American universities and colleges *notwithstanding that these talented professionals meet the statutory and regulatory criteria for an H-1B visa.* 85 Fed. Reg. at 69253

Plaintiffs depend on new and recent graduates for specialty occupations and have relied on access to highly educated and talented professionals for growth, of which foreign nationals are a critical component. Oxman Decl. ¶¶ 13; Defeo Decl. §§ 4-9. The agency's wage prioritization model under the Final Rule will have the opposite effect the agency claims the rule will achieve; many of the best and brightest will lose the opportunity for a career in the United States, not gain one. Plaintiffs will experience a dramatic increase in operational costs due to the Final Rule. *Id.* at ¶¶ 20-22; Alur Decl. ¶¶ 14-16; Gil Decl. ¶¶ 9-13; Defeo Decl. ¶¶ 4-9. The Final Rule will make it impossible for Plaintiffs representing the interests of affected employers and H-1B dependent workers to maintain the same cost-structure and employment levels. Oxman Decl. ¶¶ 22-23; Alur Decl. ¶¶ 17-18; Gil Decl. ¶¶ 14-16; Defeo Decl. ¶¶ 8-9.

Plaintiffs in medical-related fields rely on highly skilled and highly educated professionals in the healthcare industry, including nurses, physical therapists, occupational therapists, dentists, and similarly situated health care workers. Alur Decl. ¶¶ 4-10; Gil Decl. ¶¶ 3-7. These medical professionals provide critical care to our rapidly aging population in nursing homes, assisted living facilities and hospitals. *Id.* In rural areas, by virtue of funding limitation and federal reimbursements, medical professionals are paid significantly less than in costly urban centers.

Initial registrations for these freshly graduated H-1B workers fall are generally assigned a Level I wage. *The Impact on International Students of Ending the H-1B Lottery,* NATIONAL FOUNDATION FOR AMERICAN POLICY, May 2021, available at https://www.studyinternational.com/news/h-1b-visa-system-impact/. They also provide therapy services to injured workers and the foreign national nurses are on the front lines in the fight against Covid-19. Nurses and Physical Therapists are recognized shortage occupations, and, unlike non-shortage occupations, their U.S. employers are not required to test the labor market in permanent residence filings as the Federal government acknowledges there are not enough U.S. workers in these occupations. Many (if not most) of the facilities that employ these professionals do not directly hire them and – instead – turn to expert staffing services. These services operate on very tight margins to provide staff to the affected facilities at rates that are presently affordable for elderly residents, and patients and at rates which insurance companies are willing to reimburse.

The final rule will extinguish the opportunity for many foreign national physicians, nurses, and dentists thereby foreclosing membership healthcare organizations, such as PAHA and Dentists for America, from fulfilling their mission to support these vital foreign national workers and those sponsoring them for H-1B visas. Alur Declaration ¶¶ 15-18; Gil Declaration ¶¶ 10-16. As Dr. Alur, the President of PAHA states, "The final rule will worsen the shortage of healthcare professionals by making it more difficult for many employers – particularly those in impoverished areas and non-profit facilities that do not have the budget to pay Level 4 wages - to hire desperately needed physicians." Alur Declaration ¶ 14. The mismatch between well to do urban and suburban communities with inner city and rural areas when it comes to hiring doctors will only get worse because of this rule and will fundamentally disable member organizations, like PAHA and Dentists for America, that represent the interest of highly skilled foreign nationals whose continued ability

to work on H-1B visas will end, notwithstanding each members' eligibility. Alur Declaration ¶¶ 15-18; Gil Declaration ¶¶ 10-16. Given the recognized demand for labor in these occupations, America's aging parents and grandparents, injured workers and people needing nursing care will have greatly reduced or, in some locations, no access to these vital healthcare services due to the Final Rule. *Id.*

## CONCLUSION

For these reasons this Court should grant Plaintiffs' motion for summary judgment and enjoin, set aside, and vacate the Final Rule.

Dated: September 20, 2021                         Respectfully Submitted,

| | |
|---|---|
| _/s/ Jeff Joseph_<br>Jeff D. Joseph<br>Joseph & Hall P.C.<br>12203 East Second Avenue<br>Aurora, CO 80011<br>(303) 297-9171<br>jeff@immigrationissues.com<br>D.C. Bar ID: CO0084 | Jesse M. Bless<br>AMERICAN IMMIGRATION LAWYERS ASSOCIATION<br>1331 G Street NW, Ste. 300<br>Washington, D.C. 20005<br>(781) 704-3897<br>jbless@aila.org<br>D.C. Bar ID: MA0020 |
| Greg Siskind<br>Siskind Susser PC<br>1028 Oakhaven Rd.<br>Memphis, TN 39118<br>giskind@visalaw.com<br>D.C. Bar ID: TN0021 | Charles H. Kuck<br>Kuck Baxter Immigration, LLC<br>365 Northridge Rd, Suite 300<br>Atlanta, GA 30350<br>ckuck@immigration.net<br>D.C. Bar ID: GA429940 |

**CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that the foregoing pleading was submitted via the Court's EM/ECF system on September 20, 2021.  Counsel for Defendants have submitted a notice of appearance using the EM/ECF system and hereby have been properly served.

Respectfully Submitted,

/s/ Jeff Joseph
Jeff D. Joseph
Joseph & Hall P.C.
12203 East Second Avenue
Aurora, CO 80011
jeff@immigrationissues.com
D.C. Bar ID: CO0084

27