**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HUMANE SOCIETY OF NEW YORK, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*, <br><br> Defendants. | Civil Action No. 1:21-cv-01349-EGS |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
<u>TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

I.      THE H-1B VISA PROGRAM............................................................................. 2

II.     THE CURRENT H-1B PETITION PROCESS ................................................... 3

III.    THE FINAL RULE .............................................................................................. 5

STANDARD OF REVIEW ................................................................................................ 6

ARGUMENT ..................................................................................................................... 7

I.      THE FINAL RULE WAS PROMULGATED BY AN AUTHORIZED OFFICIAL. ........... 7

II.     THE FINAL RULE COMPORTS WITH THE INA.......................................... 16

        A.      The INA Is Silent With Respect to How Order Simultaneous Submissions When
                Demand for H-1B Visas Far Exceeds Numerical Limitations....................................... 16

        B.      The Final Rule Provides a Reasonable Mechanism for Ordering Simultaneous
                Submissions. ....................................................................................................................... 21

III.    DHS RESPONDED SUFFICIENTLY TO THE PUBLIC COMMENTS AND
        REASONABLY SELECTED THE COURSE OF ACTION REFLECTED IN THE
        FINAL RULE. ...................................................................................................... 24

CONCLUSION................................................................................................................. 31

i

## TABLE OF AUTHORITIES

**Cases**

*Am. Forest & Paper Ass'n v. FERC*,

 550 F.3d 1179 (D.C. Cir. 2008) ......................................................... 16, 21

*Am. Great Lakes Ports Ass'n v. Zukunft*,

 296 F. Supp. 3d 27 (D.D.C. 2017) ............................................................ 24

*Am. Whitewater v. Tidwell*,

 770 F.3d 1108 (4th Cir. 2014) ................................................................. 31

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,

 681 F.3d 427 (D.C. Cir. 2012) ................................................................. 24

*Batalla Vidal v. Wolf*,

 501 F. Supp. 3d 117 (E.D.N.Y. 2020) .................................................... 8, 12

*Bauer v. DeVos*,

 325 F. Supp. 3d 74 (D.D.C. 2018) ............................................................. 8

*Blue Ocean Inst. v. Gutierrez*,

 585 F. Supp. 2d 36 (D.D.C. 2008) ............................................................ 22

*Calloway v. Harvey*,

 590 F. Supp. 2d 29 (D.D.C. 2008) ............................................................. 6

*Carlson v. Postal Regulatory Comm'n*,

 938 F.3d 337 (D.C. Cir. 2019) ............................................................ 24, 25

*Casa de Md. v. Wolf*,

 486 F. Supp. 3d 928 (D. Md. 2020) ....................................................... 8, 12

*Chamber of Commerce v. U.S. Dep't of Homeland Sec.*,

 No. 20-cv-07331-JSW, 2021 WL 4198518 (N.D. Cal. Sept. 15, 2021) ............................ *passim*

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,

    467 U.S. 837 (1984) ..................................................................................... 1, 16, 21, 23

*Citizens for Responsibility & Ethics in Wash. v. SEC*,

    916 F. Supp. 2d 141 (D.D.C. 2013) ....................................................................... 7

*City of Portland v. EPA*,

    507 F.3d 706 (D.C. Cir. 2007) .............................................................................. 24

*Colo. River Indian Tribes v. Nat'l Indian Gaming Com'n*,

    466 F.3d 134 (D.C. Cir. 2006) .............................................................................. 23

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,

    785 F.3d 1 (D.C. Cir. 2015) .................................................................................. 24

*Encino Motorcars, LLC v. Navarro*,

    136 S. Ct. 2117 (2016) .................................................................................... 25, 29

*Fresno Mobile Radio, Inc. v. FCC*,

    165 F.3d 965 (D.C. Cir. 1999) .............................................................................. 23

*Gresham v. Azar*,

    950 F.3d 93 (D.C. Cir. 2020) ........................................................................... 23, 24

*GTE Serv. Corp. v. FCC*,

    205 F.3d 416 (D.C. Cir. 2000) .............................................................................. 22

*Immigrant Legal Res. Ctr. v. Wolf*,

    491 F. Supp. 3d 520 (N.D. Cal. 2020) ............................................................... 8, 12

*In re Grand Jury Investigation*,

    916 F.3d 1047 (D.C. Cir. 2019) ................................................................... 13, 14, 15

*Jackson v. Mabus*,

    808 F.3d 933 (D.C. Cir. 2015) ............................................................................... 7

*James Madison Ltd. by Hecht v. Ludwig*,

    82 F.3d 1085 (D.C. Cir. 1996) ............................................................................ 6, 7

*Kisor v. Wilkie*,

    139 S. Ct. 2400 (2019) ............................................................................................ 13

*La Clinica de la Raza v. Trump*,

    No. 19-CV-04980-PJH, 2020 WL 7053313 (N.D. Cal. Nov. 25, 2020) .............................. 8, 12

*Mountain States Legal Found. v. Glickman*,

    92 F.3d 1228 (D.C. Cir. 1996) .................................................................................... 8

*N.C. Fisheries Ass'n v. Gutierrez*,

    518 F. Supp. 2d 62 (D.D.C. 2007) ............................................................................ 30

*Nat'l Auto Dealers Ass'n v. FTC*,

    864 F. Supp. 2d 65 (D.D.C. 2012) ............................................................................ 22

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,

    545 U.S. 967 (2005) ................................................................................................ 16

*Nat'l Parks Conservation Ass'n v. United States*,

    177 F. Supp. 3d 1 (D.D.C. 2016) ............................................................................... 6

*Niz-Chavez v. Garland*,

    141 S. Ct. 1474 (2021) ............................................................................................ 22

*Nw. Immigrant Rts. Project v. USCIS ("NWRIP")*,

    No. 19-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8 2020) ....................................... 14, 15

*Pangea Legal Servs. v. DHS*,

    512 F. Supp. 3d 966 (N.D. Cal. 2021) ....................................................................... 8, 12

*Pub. Citizen, Inc. v. FAA*,

    988 F.2d 186 (D.C. Cir. 1993) ................................................................................... 24

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,

    374 F.3d 1251 (D.C. Cir. 2004) ................................................................................. 31

*Ryan v. United States*,

    136 U.S. 68 (1890) ................................................................................................. 13

iv

*S.J. Amoroso Const. Co. v. United States*,

    981 F.2d 1073 (9th Cir. 1992) ................................................................ 20

*Safari Aviation Inc. v. Garvey*,

    300 F.3d 1144 (9th Cir. 2002) ................................................................ 28

*Tex. Mun. Power Agency v. EPA*,

    89 F.3d 858 (D.C. Cir. 1996) ............................................................ 20, 21

*United States v. Home Concrete & Supply, LLC*,

    566 U.S. 478 (2012) .............................................................................. 20

*United States v. Mendoza*,

    464 U.S. 154 (1984) ........................................................................... 8, 12

*Walker Macy LLC v. USCIS*,

    243 F. Supp. 3d 1156 (D. Or. 2017) ............................................. *passim*

**Statutes**

5 U.S.C. § 706(2)(A) ......................................................................................... 7

5 U.S.C. § 3345(a)(2) ........................................................................................ 9

5 U.S.C. § 3347(a) ..................................................................................... 9, 14

5 U.S.C. § 3347(a)(1) ...................................................................................... 15

5 U.S.C. § 3347(a)(1)(A) .......................................................................... 9, 15

6 U.S.C. § 112(b)(1) ........................................................................................ 10

6 U.S.C. § 113 .................................................................................................. 11

6 U.S.C. § 113(g)(1) .................................................................................. 9, 13

6 U.S.C. § 113(g)(2) ................................................................................ *passim*

6 U.S.C. § 557 .................................................................................................... 3

8 U.S.C. § 1101(a)(15)(H)(i)(b) ....................................................................... 2

8 U.S.C. § 1184 ................................................................................................ 24

8 U.S.C. § 1184(c)(1) ........................................................................................... 3

8 U.S.C. § 1184(g) ............................................................................................... 2

8 U.S.C. § 1184(g)(3) ................................................................................... *passim*

Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) ....................................... 3

Pub. L. No. 114-328, 130 Stat. 2000 (Dec. 23, 2016) ..................................... 10

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................... 7

**Regulations**

8 C.F.R. § 214.2(h)(2)(i)(A) ............................................................................... 3

8 C.F.R. § 214.2(h)(8)(iii)(A)(1) ........................................................................ 5

70 Fed Reg. 23,775 (May 5, 2005) ............................................................... 4, 18

73 Fed. Reg. 15,389 (Mar. 24, 2008) ........................................................... 4, 18

Exec. Order No. 13753,

    81 Fed. Reg. 90667 (Dec. 9, 2016) .............................................................. 9

84 Fed. Reg. 888 (Jan. 31, 2019) .............................................................. 4, 5, 18

85 Fed. Reg. 69,236 (Nov. 2, 2020)....................................................... 3, 4, 18, 28

86 Fed. Reg. 1,676 (Jan. 8, 2021) ................................................................ *passim*

86 Fed. Reg. 8,543 (Feb. 8, 2021) ............................................................... 6, 28

## INTRODUCTION

The Department of Homeland Security's ("DHS's") final rule, *Modification of Registration Requirement for Petitioners Seeking To File Cap-Subject H-1B Petitions*, 86 Fed. Reg. 1,676 (Jan. 8, 2021) ("Final Rule"), is procedurally valid, consistent with the statute, and within the agency's discretionary rulemaking authority, and therefore should be upheld.

I.      The rule was properly issued by a duly authorized official.  The rule was signed by Ian J. Brekke, to whom Acting Secretary of Homeland Security Chad F. Wolf had delegated the authority.  86 Fed. Reg. at 1,782.  The service of both Acting Secretary Kevin McAleenan, who succeeded Secretary Kirstjen Nielsen after her resignation, and Acting Secretary Wolf, whom Mr. McAleenan designated as his replacement as Acting Secretary, were lawful and valid. Defendants acknowledge that a number of courts have concluded otherwise, and that another court has already vacated the Final Rule on this basis.  *See Chamber of Commerce v. U.S. Dep't of Homeland Sec.*, No. 20-cv-07331-JSW, 2021 WL 4198518 (N.D. Cal. Sept. 15, 2021).  However, this Court is not bound by that decision.

II.      The Final Rule comports with the Immigration and Nationality Act ("INA").  From 2013 to 2020, USCIS received more H-1B petitions in the first five days of filing than the annual numerical allocations provided in statute.  Although the INA prescribes that H-1B visas be issued "in the order in which petitions are filed," 8 U.S.C. § 1184(g)(3), the INA is silent with respect to how to order such simultaneous submissions.  If a "statute is silent or ambiguous with respect to the specific issue," the Court should defer to the agency's interpretation so long as it is "based on a permissible construction of the statute."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 843 (1984).  In deciding how to order simultaneous or nearly simultaneous submissions, DHS turned to an important purpose of the H-1B visa program and reasonably determined that a wage-level-based selection process will implement that purpose of the statute and that nothing in the statute requires random selection.

III.    Finally, in the course of the rulemaking at issue here, DHS adequately responded to all significant comments.  Specifically, DHS addressed the issues raised in the comments highlighted by Plaintiffs concerning recent graduates and reliance interests with reasoned explanations.

## BACKGROUND

### I.    THE H-1B VISA PROGRAM

The Immigration and Nationality Act ("INA") provides for the admission of certain foreign nationals as nonimmigrants[1] on a temporary basis to perform work in the United States under the H-1B and other visa classifications.  The H-1B program allows U.S. employers to temporarily employ foreign workers in specialty occupations, 8 U.S.C. § 1101(a)(15)(H)(i)(b), defined as occupations that require the "theoretical and practical application of a body of highly specialized knowledge[]" and a bachelor's or higher degree in the specific specialty, or its equivalent.  *Id*. § 1184(i)(1)(A).

Congress has established limits on the number of foreign workers who may be granted initial H-1B nonimmigrant visas or status each fiscal year ("FY"), commonly referred to as the "H-1B cap."  *Id.* § 1184(g).  The total number of foreign workers who may be granted initial H-1B nonimmigrant status during any FY currently may not exceed 65,000.  *Id.* § 1184(g)(1)(A)(vii).  Certain petitions are exempt from the 65,000 numerical limitation.  The annual exemption from the 65,000 cap for H-1B workers who have earned a qualifying U.S. master's or higher degree may not exceed 20,000 foreign workers.  *Id.* § 1184(g)(5)(C).  H-1B petitions for noncitizens who

---

[1] There are two general categories of U.S. visas: immigrant and nonimmigrant.  Immigrant visas are issued to foreign nationals who intend to live permanently in the United States.  Nonimmigrant visas are for foreign nationals who enter the United States on a temporary basis—for tourism, medical treatment, business, temporary work, study, or other reasons.  *See* U.S. Customs and Border Protection, Requirements for Immigrant and Nonimmigrant Visas, *available at* https://www.cbp.gov/travel/international-visitors/visa-waiver-program/requirements-immigrant-and-nonimmigrant-visas?_ga=2.173133027.1101199272.1633209911-1398086623.1628456546 (last visited Oct. 7, 2021).

are employed or have received offers of employment at institutions of higher education, nonprofit entities related to or affiliated with institutions of higher education, or nonprofit research organizations or government research organizations, are also exempt from the cap. *Id.* § 1184(g)(5)(A), (B). The limitation also generally does not apply to H-1B petitions filed on behalf of certain noncitizens who have previously been counted against the cap. *Id.* § 1184(g)(7).

## II.    THE CURRENT H-1B PETITION PROCESS

An employer desiring to employ an H-1B worker must file a petition with DHS's United States Citizenship and Immigration Service ("USCIS") to obtain classification of the foreign national as an H-1B worker. *See* 8 U.S.C. § 1184(c)(1) (requiring an importing employer to file an H-1B petition and authorizing the Secretary[2] to "prescribe" how an importing employer may petition and the information that an importing employer must provide in the petition); 8 C.F.R. § 214.2(h)(2)(i)(A). DHS determines, among other things, whether the employer's position qualifies as being in a specialty occupation and, if so, whether the nonimmigrant worker is qualified for the position. *Id.* § 214.2(h)(4)(i)(B)(2).

The number of H-1B cap-subject petitions, including those filed for the advanced degree exemption, regularly exceeds the annual H-1B numerical allocations. *Modification of Registration Requirement for Petitioners Seeking To File Cap-Subject H-1B Petitions*, 85 Fed. Reg. 69,236, 69,238 (Nov. 2, 2020). The INA provides that "[a]liens who are subject to the numerical limitations . . . shall be issued visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas or status." 8 U.S.C. § 1184(g)(3). However, in each cap season from FY2014, which commenced in April 2013, to FY2020, which commenced in

---

[2] As of March 1, 2003, in accordance with section 1517 of Title XV of the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002), any reference to the Attorney General in a provision of the INA describing functions which were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. § 557 (2003) (codifying HSA, Title XV, § 1517).

April 2019, USCIS received more H-1B petitions in the first five days of filing than the annual H-1B numerical allocations permit.  85 Fed. Reg. at 69,237-38.  Indeed, each year USCIS received hundreds of thousands of complete H-1B petitions in the mail on the same day and had no reliable way to determine which petition was "filed" first based on when the petition was received.  *Id.* at 69,238.  Because all the petitions were in essence "filed" simultaneously, the agency could not follow the INA's command to issue H-1B visas or otherwise provide H-1B status in the order in which petitions were filed.  *Id.*

In 2005, to address issues with simultaneous submissions, USCIS promulgated an interim rule allowing for the first time a random selection process, if necessary, to select between petitions received on the "final receipt date," *i.e.*, the date the number of petitions necessary to meet the statutory cap would be met.  *Allocation of Additional H-1B Visas Created by the H-1B Reform Act of 2004*, 70 Fed Reg. 23,775, 23,778 (May 5, 2005).  However, under that system, USCIS found that employers spent significant effort and money to send petitions through overnight delivery to ensure they arrived on the first day that petitions were allowed, burdening employers, delivery services, and USCIS.  *Petitions Filed on Behalf of H-1B Temporary Workers Subject to or Exempt From the Annual Numerical Limitation*, 73 Fed. Reg. 15,389, 15,391 (Mar. 24, 2008).  In 2008, USCIS promulgated a new interim rule aimed at minimizing that burden by providing for random selection (commonly referred to as a lottery) from all applications received in the first five business days, if the number to meet the statutory cap was met in those five days.  *Id.* at 15,392.  Those that were considered filed would be processed while those that were rejected would be sent back to the petitioner.  Nevertheless, the rejection and return of tens of thousands of petitions each year still presented an undue burden on the agency and on the public.  *Registration Requirement for Petitioners Seeking To File H-1B Petitions on Behalf of Cap-Subject Aliens*, 84 Fed. Reg. 888, 890 (Jan. 31, 2019).

To further address these issues, in 2019, DHS promulgated a regulation establishing a registration process before any H-1B cap-subject petition can be filed.  *See* 84 Fed. Reg. at 888.

Under this registration process, all petitioners seeking to file an H-1B cap-subject petition, including a petition eligible for the advanced degree exemption, must first electronically submit a registration, for which the cost and time to prepare is significantly less than a complete H-1B petition, during the registration period set by USCIS (a minimum of 14 days) for each beneficiary on whose behalf they seek to file such a petition, unless USCIS suspends the registration requirement.  8 C.F.R. § 214.2(h)(8)(iii)(A)(1), (3).  At the conclusion of the initial registration period, if more registrations are submitted than projected as needed to reach the numerical allocations, under the 2019 rule USCIS randomly selects from among properly submitted registrations the number of registrations projected as needed to reach the H-1B numerical allocations.  *Id.* § 214.2(h)(8)(iii)(A)(5)(ii).  USCIS first selects registrations submitted on behalf of all beneficiaries, including those eligible for the advanced degree exemption.  *Id.*  USCIS then selects from the remaining registrations a sufficient number projected as needed to reach the advanced degree exemption.  *Id.* § 214.2(h)(8)(iii)(A)(6)(ii).  A prospective petitioner whose registration is selected is then eligible to file an H-1B cap-subject petition for the selected registration during the associated filing period.  *Id.* § 214.2(h)(8)(iii)(A)(1), (D)(1).  When registration is required, a petitioner seeking to file an H-1B cap-subject petition is not eligible to file the petition unless the petition is based on a valid, selected registration for the beneficiary named in the petition.  *Id.* § 214.2(h)(8)(iii)(D)(1).

### III.    THE FINAL RULE

On January 8, 2021, DHS published a final rule further amending the process by which USCIS will select H-1B registrations for filing of H-1B cap-subject petitions (or H-1B petitions for any year in which the registration requirement is suspended).  *Modification of Registration Requirement for Petitioners Seeking To File Cap-Subject H-1B Petitions*, 86 Fed. Reg. 1,676 (Jan. 8, 2021) ("the Final Rule").  These revisions were most recently set to become effective on December 31, 2021.  *See Modification of Registration Requirement for Petitioners Seeking to File Cap-Subject H-1B Petitions; Delay of Effective Date*, 86 Fed. Reg. 8,543 (Feb. 8, 2021).  However,

5

the rule was vacated by the United States District Court for the Northern District of California on September 15, 2021. *See Chamber of Commerce v. U.S. Dep't of Homeland Sec.*, No. 20-cv-07331-JSW, 2021 WL 4198518 (N.D. Cal. Sept. 15, 2021).

The revised regulations would allow for ranking and selection of registrations based on wage levels. Specifically, when applicable, USCIS would rank and select the registrations received during the registration period generally on the basis of the highest Occupational Employment Statistics ("OES") wage level that the proffered wage equals or exceeds for the relevant Standard Occupational Classification ("SOC") code in the area of intended employment, beginning with OES wage level IV and proceeding in descending order with OES wage levels III, II, and I. 86 Fed. Reg. at 1,676, 1,677, 1,732 *to be codified at* 8 C.F.R. § 214.2(h)(8)(iii)(A)(1)(i). (The proffered wage is the wage that the employer intends to pay the beneficiary. *Id.* at 1,677.) If USCIS received and ranked more registrations at a particular wage level than the projected number needed to meet the applicable numerical allocation, USCIS would randomly select from all registrations within that wage level a sufficient number of registrations needed to reach the applicable numerical limitation. *Id.* at 1,717. This final rule would not affect the order of selection as between the regular cap and the advanced degree exemption. *Id.* The wage level ranking would occur first for the regular cap selection and then for the advanced degree exemption. *Id.*

## STANDARD OF REVIEW

The Court's review of the parties' cross motions for summary judgment is "limited to the administrative record, which includes all materials compiled by the agency that were before the agency at the time the [challenged] decision was made." *Calloway v. Harvey*, 590 F. Supp. 2d 29, 36 (D.D.C. 2008) (quotation marks omitted); *see also James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996). Summary judgment is typically warranted if the record shows that the case has no genuine issue of material fact and that "the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)-(c). But in an action for judicial review of agency action, "the Rule 56 standard does not apply." *Nat'l Parks Conservation Ass'n v. United*

*States*, 177 F. Supp. 3d 1, 12 (D.D.C. 2016).  Rather, the "court's review is limited to the administrative record . . . and its role is limited to determining whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (citation, quotation marks, and brackets omitted); *see also James Madison Ltd. by Hecht*, 82 F.3d at 1096 ("Generally speaking, district courts reviewing agency action . . . operate [ ] as appellate courts resolving legal questions.") (citation omitted).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Citizens for Responsibility & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013).

Under the Administrative Procedure Act, an agency decision is set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This standard of review is "deferential," and does not allow a court to substitute its judgment for that of the agency.  *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015) ("The question is not what we would have done, nor whether we agree with the agency action[; but] . . . whether the agency action was reasonable and reasonably explained.").

## ARGUMENT[3]

## I.    THE FINAL RULE WAS PROMULGATED BY AN AUTHORIZED OFFICIAL.

The Final Rule was properly issued by a duly authorized official.  The rule was signed by Ian J. Brekke, to whom Acting Secretary of Homeland Security Chad F. Wolf had delegated the

---

[3] Plaintiffs open their brief by arguing that each Plaintiff has standing to bring this lawsuit; however, many of the declarations that Plaintiffs rely upon do not actually provide the information necessary to establish standing.  Notwithstanding some of the deficiencies in the Plaintiffs' declarations, it does appear that at least one Plaintiff likely has standing to pursue the relief sought by this litigation.  Specifically, Plaintiffs have submitted a declaration attesting that Plaintiff Hodges Bonded Warehouse, Inc. sponsors foreign nationals through temporary employment using H-1B visas, and that those foreign nationals are "only paid at a Level 1 wage."  *See* Decl. of Lance Hunter ¶¶ 8, 10, ECF No. 14-6 ("Hunter Decl.").  Notably, Plaintiffs did not cite this declaration

authority to sign the rule. 86 Fed. Reg. at 1,782. Plaintiffs argue that Chad Wolf did not lawfully occupy the position of Acting Secretary and, therefore, "[h]e had no authority to promulgate the Final Rule." Pls.' Mem. for Summary Judgment, at 15, ECF No. 14 ("Pls.' Mem."). Under Plaintiffs' theory, Secretary Nielsen's April 2019 order of succession applied only to vacancies caused in emergency situations, and not to vacancies caused by resignations. *Id.* at 17. Thus, Plaintiffs argue that the service of Acting Secretary McAleenan, who succeeded Secretary Nielsen after her resignation, and Acting Secretary Wolf, whom McAleenan designated as his replacement, were unlawful. *Id.* at 17-18.

Defendants acknowledge that all the courts that have considered this issue have concluded that Mr. McAleenan's service as Acting Secretary of Homeland Security and Mr. Wolf's subsequent service in the same position were invalid. *See Chamber of Commerce*, 2021 WL 4198518, at *4-5; *Pangea Legal Servs. v. DHS*, 512 F. Supp. 3d 966, 973-75 (N.D. Cal. 2021); *La Clinica de la Raza v. Trump*, No. 19-CV-04980-PJH, 2020 WL 7053313, at *6–7 (N.D. Cal. Nov. 25, 2020); *Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117, 129-32 (E.D.N.Y. 2020); *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 533-35 (N.D. Cal. 2020); *Casa de Md. v. Wolf*, 486 F. Supp. 3d 928, 957-60 (D. Md. 2020). Defendants further acknowledge that the substance of Defendants' arguments here remain similar to if not the same as those asserted in these prior cases. Nevertheless, Defendants maintain the position that the April 2019 Order designated an order of succession that applied to all vacancies, no matter the reason. *Cf. United States v. Mendoza*, 464 U.S. 154, 160 (1984) ("A rule allowing nonmutual collateral estoppel against the government in . . . cases [against different parties which nonetheless involve the same legal issues] would

anywhere in their motion for summary judgment. Notwithstanding Plaintiffs' oversight, this declaration appears to establish standing, and therefore the Court need not consider the standing of other plaintiffs in this lawsuit. *Bauer v. DeVos*, 325 F. Supp. 3d 74, 88-89 (D.D.C. 2018) (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)). Accordingly, Defendants do not address standing in this brief.

substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue.").

The Homeland Security Act allows the Secretary of Homeland Security to devise an order of succession that supersedes an order of succession issued under the Federal Vacancies Reform Act ("FVRA"). *See* 6 U.S.C. § 113(g)(1), (2)); *see also* 5 U.S.C. § 3347(a)(1)(A) (recognizing an exception to the Federal Vacancies Reform Act for statutory provisions that "expressly . . . authorize[] . . . the head of an Executive department[] to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity[]"). Then-Secretary Nielsen did just that in April 2019, using newly granted legislative authority to supersede an order of succession issued in 2016.

On December 9, 2016, the President exercised his authority under the FVRA and issued an executive order that prescribed an order of succession for the office of Secretary of Homeland Security. *See* Exec. Order No. 13753, 81 Fed. Reg. 90667 (Dec. 9, 2016) ("EO 13753"); 5 U.S.C. § 3345(a)(2)-(3) (allowing the President to designate an acting official). At the time, because 6 U.S.C. § 113(g)(1) of the Homeland Security Act had not been enacted, the FVRA was the "exclusive means for temporarily authorizing" an Acting Secretary of Homeland Security. *See* 5 U.S.C. § 3347(a) (FVRA is generally the "exclusive means for temporarily authorizing an acting official," unless another statute provides otherwise). Six days later, then-Secretary Jeh Johnson signed a revision to a document the agency uses to compile orders of succession and delegations of authority for various positions in DHS. *DHS Orders of Succession and Delegations of Authorities for Named Positions*, DHS Delegation No. 00106, Revision No. 08 (Dec. 15, 2016) ("Revision 8") (signed at page 3), Ex. A hereto. In Part II.A of that revised document, Mr. Johnson stated that "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by [EO] 13753." *Id.* at 1, pt. II.A. This was not an order of the Secretary (because, again, at the time the Secretary lacked the authority to designate an order of succession); it only noted that the President's list in EO 13753 would control

the order of succession.  In Part II.B, Secretary Johnson separately exercised his delegation authority under 6 U.S.C. § 112(b)(1), "hereby delegat[ing]" to enumerated officials "[his] authority. . . in the event [he is] unavailable to act during a disaster or catastrophic emergency." *Id.* at 1, pt. II.B.  The list of officials to whom Mr. Johnson delegated his authority was set out in Annex A to Delegation 00106.  *Id.* at A-1.

After Secretary Johnson revised Delegation 00106, Congress then gave the Secretary the authority to designate an order of succession.  It did so on December 23, 2016.  Pub. L. No. 114-328, § 1903, 130 Stat. 2000, 2672 (Dec. 23, 2016).  That designation authority was first exercised by a subsequent Secretary, Secretary Nielsen.  On April 9, Secretary Nielsen issued an order titled "Amending the Order of Succession in the Department of Homeland Security."  Designation of an Order of Succession for the Secretary (Apr. 9, 2019) ("April 2019 Order"), Ex. B hereto.  The order states:

> By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows:
>
> Annex A . . . of Delegation No. 00106 is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof:
>
> Annex A. Order for Delegation of Authority by the Secretary of the Department of Homeland Security.
>
> [A numbered list of 18 officials appears here].
>
> No individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation.
>
> *Id.* at 2.

By its terms, the order "designate[s] the order of succession for the Secretary" under 6 U.S.C. § 113(g)(2), the provision that authorizes the Secretary to designate an order of succession

for her office.  It does so by revising the list of officials in Annex A, which previously had applied only to delegations of authority under § 112(b)(1), and by using the revised list as the new order of succession as well as delegation.  The order thus harmonized the order of succession for vacancies with the order of delegation in cases of emergency.

Secretary Nielsen's order superseded the order of succession previously prescribed by EO 13753 because it applied "notwithstanding" the FVRA.  *See* 6 U.S.C. § 113(g)(2). Mr. McAleenan, the Senate-confirmed Customs and Border Protection Commissioner, became Acting Secretary under Ms. Nielsen's order when Ms. Nielsen resigned.[4]

Secretary Nielsen exercised her authority to "designate the order of succession" under "6 U.S.C. § 113(g)(2)."  April 2019 Order at 2.  The order's signed transmittal memorandum confirms that a new order of succession was being established.  The memorandum states: "By approving the attached document [the order], you will designate your desired order of succession for the Secretary of Homeland Security in accordance with your authority pursuant to Section 113(g)(2) of title 6, United States Code." *Id.* at 1; *see also id.* (noting Secretary's "approval of the attached document" will designate officers to serve as Acting Secretary under 6 U.S.C. § 113).

The fact that Annex A formerly applied only to emergency succession scenarios does not mean that EO 13753 controlled the order of succession when Secretary Nielsen resigned.  This is because Secretary Nielsen's order harmonized the order of succession for vacancies with the order of delegation in cases of emergency.  To be sure, DHS did not accurately update an internal delegation compilation—one key factor that led to the concerns about Mr. McAleenan's delegation.  But the order and transmittal signed by Secretary Nielsen is the governing document, not the internal DHS compilation.  The fact that the internal compilation was not accurately

---

[4] The first two positions in Secretary Nielsen's order—the Deputy Secretary and Under Secretary for Management—were vacant at the time.

updated as an administrative matter to reflect that Secretary Nielsen's order superseded EO 13753—which it did as a matter of law—does not change the legal effect of her order.

The Court should not follow the district court decisions that concluded that the list set out in EO 13753—not the list set out in Secretary Nielsen's April 9 order—controlled the order of succession when Ms. Nielsen resigned.[5]

*First*, those decisions overlooked that Part II.A of DHS Delegation 00106 did not itself prescribe the order of succession; it merely identified the document (EO 13753) that did so. There was thus no need for Secretary Nielsen to amend the text of Part II.A.[6] By designating an order of succession under 6 U.S.C. § 113(g)(2), Secretary Nielsen's order superseded EO 13753 as a matter of law. Nothing more was required.

*Second*, those decisions concluded that Secretary Nielsen's order applied only when the Secretary was temporarily unavailable because of a disaster or emergency because the order merely revised Annex A of Delegation 00106—but in doing so, they conflated orders of succession and delegations of authority. When Secretary Nielsen issued her order, Annex A listed the officials to whom the Secretary had temporarily *delegated* authority under § 112(b)(1) during times of

---

[5] *Casa de Md.*, 486 F. Supp. 3d at 957-60; *Immigrant Legal Res. Ctr.*, 491 F. Supp. 3d at 533-36; *Batalla Vidal*, 501 F. Supp. 3d at 129-32; *La Clinica de la Raza*, 2020 WL 7053313, at *6–7; *Pangea Legal Servs.*, 512 F. Supp. 3d at 973-75.

Although the Government did not appeal those erroneous decisions, this Court should not hold that against the Government here. *See Mendoza*, 464 U.S. at 161 ("Unlike a private litigant who generally does not forego an appeal if he believes that he can prevail, the Solicitor General considers a variety of factors, such as the limited resources of the government and the crowded dockets of the courts, before authorizing an appeal.").

[6] When Acting Secretary McAleenan later issued a new order of succession on November 8, 2019, his order amended the text of Part II.A of Delegation 00106. Amendment to the Order of Succession for the Secretary (Nov. 8, 2019) ("November 2019 Order"), Ex. C. hereto. The amending language merely provided additional clarity about the operative order of succession; it did not (and could not) change the prior legal effect of Secretary Nielsen's order.

unavailability due to disaster or catastrophic emergency. *See* Revision 8 at 1, pt. II.B. But Secretary Nielsen's order put the list of officials in Annex A to an additional use under a different statutory authority. The order expressly made the revised Annex A the order of *succession* under § 113(g)(2), which applies in cases of "absence, disability, or vacancy in office," 6 U.S.C. § 113(g)(1). These district court decisions focus solely on the language of the order that amends Annex A and ignore the order's critical language. *See, e.g.*, April 2019 Order at 2 ("By the authority vested in me as Secretary of Homeland Security, *including . . . 6 U.S.C. § 113(g)(2), I hereby designate the order of succession* for the Secretary of Homeland Security *as follows . . . .*" (emphases added)); *id.* (noting the order is a "designation" of who "shall act as Secretary").

The intent of Secretary Nielsen's order was confirmed by actions surrounding its execution. Ms. Nielsen personally swore in Mr. McAleenan as Acting Secretary under her order,[7] and DHS treated Mr. McAleenan as the Acting Secretary and identified § 113(g)(2) as the authority for the acting designation in its official notice to Congress of his acting service, *see* Letter from Neal J. Swartz, Associate General Counsel for General Law, DHS, to Hon. Michael R. Pence, President of the Senate (Apr. 11, 2019), Ex. D hereto. Even if the order's terms were ambiguous, that contemporaneous understanding would be entitled to significant weight. *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–18 (2019).

Mr. McAleenan, as the designated Acting Secretary, was authorized to exercise all of the Secretary's authority because "an acting officer is vested with the same authority that could be exercised by the officer for whom he acts." *In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019); *see also Ryan v. United States*, 136 U.S. 68, 81 (1890). This included the

---

[7] The Border Observer, CBP Commissioner Kevin McAleenan sworn-in as the Acting DHS Secretary; Opens New DHS Headquarters, *available at* https://theborderobserver.wordpress.com/2019/04/11/cbp-commissioner-kevin-mcaleenan-sworn-in-as-the-acting-dhs-secretary/ (last visited Oct. 7, 2021); Homeland Security, Farewell Message from Secretary Kirstjen M. Nielsen (Apr. 10, 2019), *available at* https://www.dhs.gov/news/2019/04/10/farewell-message-secretary-kirstjen-m-nielsen (last visited Oct. 7, 2021) (Ms. Nielsen's farewell message to DHS noting that Mr. McAleenan "will now lead DHS as your Acting Secretary").

Secretary's authority to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." *See* 6 U.S.C. § 113(g)(2).  Acting Secretary McAleenan acted under this authority when he amended the succession order, under which Mr. Wolf would become Acting Secretary upon Mr. McAleenan's resignation.  *See* November 2019 Order.

Plaintiffs argue that even if Mr. McAleenan properly served under Secretary Nielsen's order, he still could not designate the succession order that Mr. Wolf began serving under in November 2019 because an Acting Secretary cannot designate an order of succession.  Pls.' Mem. at 18.  The Government's position is that this argument is not correct, and instead an Acting Secretary may designate a new order of succession under § 113(g)(2).

An acting official is vested with *all* the authority of the vacant office.  *See In re Grand Jury Investigation*, 916 F.3d at 1055.  This includes authority under the Appointments Clause.  *See id.* at 1054–55 ("Acting Attorney General Rosenstein was the 'Head of Department' *under the Appointments Clause* as to the matter on which the Attorney General was recused." (emphasis added)); *id.* at 1055 (holding that "an Acting Attorney General becomes the head of the Department when *acting in that capacity because an acting officer is vested with the same authority* that could be exercised by the officer for whom he acts[]" (emphasis added)).  That same reasoning applies to an Acting Secretary under § 113(g)(2).  Indeed, it would be unusual for an acting principal officer to be vested with every power of a vacant office *except* the power to appoint inferior officers.

The FVRA does not limit this authority.  Relying on the FVRA's requirement that an agency-specific vacancy statute must "expressly" grant the head of a Department the power to designate successors, the *Nw. Immigrant Rts. Project v. USCIS ("NWIRP")*, No. 19-3283 (RDM), 2020 WL 5995206, at *19 (D.D.C. Oct. 8, 2020), court concluded that an Acting Secretary cannot exercise the § 113(g)(2) authority because no statute expressly gives the Acting Secretary this authority.  But § 113(g)(2) operates "[n]otwithstanding" the FVRA.  *See* 6 U.S.C. § 113(g)(2).  Thus, the FVRA, including its exclusivity rule in 5 U.S.C. § 3347(a), does not limit the authority

conferred by § 113(g)(2).  And even if § 3347 did apply, it does not support the court's conclusion. Section 113(g)(2) expressly authorizes the Secretary of Homeland Security, (the "head of an Executive department," 5 U.S.C. § 3347(a)(1)(A)), to designate an acting official.  That is all that is required for § 113(g)(2) to come within the exception to the FVRA's exclusivity.  5 U.S.C. § 3347(a)(1).  The court was thus incorrect to conclude that "statutory language [must] expressly vest[] the acting official with [the same] authority" held by the Secretary.  *See NWIRP*, 2020 WL 5995206, at *19.  Indeed, an "acting officer is vested with the same authority that could be exercised by the officer for whom he acts," "by virtue of becoming the [a]cting" official, not because of a separate grant of statutory authority.  *See In re Grand Jury Investigation*, 916 F.3d at 1055–56.

In sum, as the lawfully serving Acting Secretary, Mr. McAleenan had the power to designate an order of succession under § 113(g)(2), *see* November 2019 Order, and Mr. Wolf lawfully was designated as Acting Secretary under this order.[8]  Mr. Wolf's delegation of signatory authority to Mr. Brekke was therefore valid, rendering the Final Rule valid under the HSA and the FVRA.

To the extent this Court disagrees with the Government's argument that the Final Rule was promulgated by an authorized official, that should end the Court's inquiry.  If the Court were to rule for Plaintiffs on the FVRA issue, the remedy would be invalidation of the Final Rule—indeed, as Plaintiffs acknowledge, *see* Pls.' Mem. at 1, the Final Rule has already been vacated on this basis.  *See Chamber of Commerce*, 2021 WL 4198518, at *5.  With the Final Rule set aside, the regulation providing for randomized H-1B cap selection that was in place prior to the Final Rule, and that is still in place currently, would continue to be the controlling regulation.  Accordingly, it would not serve judicial efficiency for this Court to opine on the legality of a defunct rule based on speculation that a similar rulemaking might occur in the future.  For these reasons, a ruling in

---

[8]  Defendants do not here rely on various designations made by Mr. Gaynor that followed court rulings rejecting the designation of Mr. Wolf.  *See* Pls.' Mem. at 19.

favor of Plaintiffs on the authorized official issue should end the Court's inquiry. *See, e.g.*, *Chamber of Commerce*, 2021 WL 4198518, at \*5 (declining to address plaintiffs' other legal arguments after ruling in plaintiffs' favor on a dispositive FVRA issue); Order at 5, *L.M.-M. v. Cuccinelli*, Case No. 1:19-cv-02676-RDM (D.D.C. March 1, 2020), ECF No. 34 (same).

## II.    THE FINAL RULE COMPORTS WITH THE INA.

When faced with evaluating an agency's interpretation of a statute it is charged with administering, the Court should apply the two-step framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). First, the Court must determine whether "Congress has spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter[]" and both the court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue," the court should defer to the agency's interpretation so long as it is "based on a permissible construction of the statute." *Id.* at 843. That is true "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); *see also Am. Forest & Paper Ass'n v. FERC*, 550 F.3d 1179, 1183 (D.C. Cir. 2008) ("Step two of *Chevron* does not require the best interpretation, only a reasonable one."). Thus, even if the agency's interpretation is not the best interpretation, it is entitled to "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

### A. The INA Is Silent With Respect to How to Order Simultaneous Submissions When Demand for H-1B Visas Far Exceeds Numerical Limitations.

Plaintiffs argue that the Final Rule must be set aside because it "contravenes the plain language of the INA," Pls.' Mem. at 10-15, but the INA is silent on the particular issue that the Final Rule intends to address: how to handle simultaneous submissions. *See Walker Macy LLC v. USCIS*, 243 F. Supp. 3d 1156, 1170 (D. Or. 2017) ("The relevant question is whether the statute unambiguously directs how to handle multiple submissions received on the same day or at the

same time. The statute does not. It provides no guidance on how to 'order' simultaneous submissions."). Rather, the statute sets annual limitations on the number of noncitizens who may be issued initial H-1B visas or otherwise provided H-1B nonimmigrant status, and it provides that noncitizens "shall be issued [H-1B] visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas." 8 U.S.C. § 1184(g)(3). Plaintiffs contend that this statutory command is unambiguous and that the agency's construction is "owed no deference." Pls.' Mem. at 13-14. In doing so, Plaintiffs' argument glosses over the fact that because "an indiscriminate application of this statutory language would lead to absurd or arbitrary results[,]" "the longstanding approach to implementing the numerical limitation has been to project the number of petitions needed to reach the numerical limitation" rather than issuing visas in a strict order. 86 Fed. Reg. at 1,695. Plaintiffs do not appear to challenge that longstanding approach, but rather read into the statute an unspoken command that DHS may not rely on any substantive criteria when ordering simultaneous submissions. But the INA contains no such command. In fact, the statute does not specify how petitions must be selected and counted toward the numerical allocations when USCIS receives (or expects to receive) more petitions on the first day than are projected as needed to reach the H-1B numerical allocations. In light of that statutory silence, "USCIS has discretion to decide how best to order those petitions," *Walker Macy*, 243 F. Supp. 3d at 1176, and the Final Rule is an exercise of that discretion.

For at least the last decade, H-1B petitions have consistently exceeded the number needed to reach the cap for such visas. *See* 85 Fed. Reg. at 69,237; *see also id.* at 69,239 (discussing the "rush of simultaneous submissions at the beginning of the H-1B petition period[]"). From 2013 to 2020, USCIS received more H-1B petitions in the first five days of filing than the annual H-1B numerical allocations. *Id.* In such circumstances, "[a] rote interpretation of" the INA's requirement that visas be issued in the order in which petitions are filed "is impossible" because of the sheer volume of simultaneous applications. *Id.* at 69,238 (explaining that "under the prior

17

petition selection process, . . . USCIS received hundreds of thousands of full H-1B petitions in the mail on the same day and had no legitimate way to determine which petition was 'filed' first").

Over the years, DHS has taken several steps to facilitate the selection of H-1B cap-subject petitions in such circumstances.  As explained above, in 2005, USCIS promulgated an interim rule allowing for the first time a random selection process, if necessary, to select between petitions received on the "final receipt date."  70 Fed Reg. at 23,778.  Then in 2008, USCIS promulgated a new interim rule providing for random selection from all petitions received in the first five business day, if the number to meet the statutory cap was met in those five days.  73 Fed. Reg. at 15,392.  In 2019, DHS promulgated a final rule implementing the current H-1B registration process to facilitate the selection of H-1B cap-subject petitions.  *See generally* 84 Fed. Reg. 888.  Under that rule—which Plaintiffs do not challenge here—petitioners seeking to file H-1B cap-subject petitions, including those eligible for the advanced degree exemption, must first electronically register with USCIS during a designated registration process.  *Id.* at 888.  "[O]nly those whose registrations are selected . . . will be eligible to file an H-1B cap-subject petition for those selected registrations during the associated filing period."  *Id.* at 889.

With the registration requirement in place, if the number of registrations does not exceed the number projected as needed to reach the numerical limitations, USCIS will select all properly submitted registrations.  In the event that registrations exceed the number projected as needed to reach the numerical limitations (which is to be expected given the oversubscription of the program for the past ten years), however, the agency selects registrations and only those prospective petitioners with valid, selected registrations will be eligible to file H-1B cap-subject petitions for the beneficiary named in their selected registration(s).  Indeed, that is precisely what occurred the first time the registration system was implemented in 2020, when USCIS received far more H-1B registrations in the initial registration period than projected as needed to reach the annual H-1B

numerical allocations.  *See* 85 Fed. Reg. at 69,237-38.[9]  Accordingly, the Final Rule prioritizes

certain registrations (or petitions, if the registration requirement is suspended) only where the

agency is already tasked with choosing between what would otherwise be simultaneous

submissions—in other words, where the INA's silence shows that "Congress left to the discretion

of USCIS how to handle simultaneous submissions[.]"  *Walker Macy*, 243 F. Supp. 3d at 1176.[10]

Plaintiffs try to sidestep the statutory silence by arguing that there are two steps involved

in the process of selecting an H-1B petition: first, "collect[ing] registrations" and then "selecting

among the chosen visas for filing," and suggesting that the agency has discretion at this first step

(collecting) but no discretion at the second step (selecting).  Pls.' Mem. at 13.  But that distinction

is a red herring, and Plaintiffs' argument is not supported by the statutory text at issue.  As an

initial matter, Plaintiffs' argument conflates multiple aspects of the H-1B visa program.  Plaintiffs

are correct that the registration process "[i]s an antecedent procedural requirement that must be

---

[9]  During the initial registration period for the FY 2021 H-1B numerical allocations, USCIS received 274,237 H-1B registrations and initially randomly selected 106,100 registrations (the number projected as needed to reach the numerical limit); USCIS later randomly selected an additional 18,315 registrations.  Overall, the number of registrations received (274,237) was more than double the total number selected (124,415).  *See* AR003489-90; *see also* USCIS, H-1B Electronic Registration Process, *available at* https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process (last visited Oct. 8, 2021).

[10]  Plaintiffs may try to argue that an electronic system should allow the agency to more easily order submissions by time of receipt than a system that relies on mailed-in petitions, and thus that the agency should select registrations based solely on submission time.  But as the agency explained in its proposed rule and affirmed in the Final Rule, such a requirement is still "impossible to apply under the current electronic registration system because it would result in hundreds of thousands of registrants uploading registration information online at the exact same moment, at best leaving computer speed as the determinant as to who registered first."  85 Fed. Reg. at 69,238; *see also* 86 Fed. Reg. 1,695 n.71.  As anyone who has ever tried to purchase in-demand concert tickets online knows well, there is an inherent arbitrariness to who is able to successfully load the same website as thousands of other people simultaneously, and there is no definitive reason to prefer such arbitrariness over another selection process. *Cf. Walker Macy*, 243 F. Supp. 3d at 1175 (discussing the arbitrariness of "taking the petitions (or portion of the petitions) that by chance were sent by the [common] carrier that just happened to deliver them first on a particular day").

met before a petition is deemed to be properly filed."  84 Fed. Reg. at 896; *see also* pages 4-5, *supra* (discussing the registration requirement).  But that has little bearing on the issue before this Court.  The registration process did not exist when USCIS first implemented its random selection process, and the Final Rule would apply even in the absence of a registration requirement.  *See* 86 Fed. Reg. at 1,676 (noting that the Final Rule amends the regulations governing the process for selecting H-1B registrations "or H-1B petitions for any year in which the registration requirement is suspended").  Thus, the question of whether the registration process occurs pre- or post-filing is of little relevance to this case.

Further, Plaintiffs' argument rewrites the statutory text.  Contrary to Plaintiffs' argument, the statute does not provide that "visas 'shall' be *selected* in the order filed."  Pls.' Mem. at 13 (emphasis added).  Rather, section 1184(g)(3) provides that "[a]liens who are subject to the numerical limitations of" the relevant statutory provision—such as those seeking cap-subject H-1B visas—"shall be *issued* visas (or otherwise provided nonimmigrant status) in the order in which petitions are filed for such visas or status."  8 U.S.C. § 1184(g)(3) (emphasis added). This distinction is not merely a matter of semantics.  As the court held in *Walker Macy*, section 1184(g)(3) provides "no guidance on how to 'order' simultaneous submissions." 243 F. Supp. 3d at 1170.  That statutory silence exists regardless of whether Plaintiffs characterize the agency's actions as collecting or selecting.  And that statutory silence leaves room for agency discretion. *See United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 488 (2012) ("[A] statute's silence or ambiguity as to a particular issue means that Congress has not 'directly addressed the precise question at issue' (thus likely delegating gap-filling power to the agency).").  "Without language in the statute so precluding" wage-based selection between simultaneous submissions, "it must be said that Congress has not spoken to the issue."  *S.J. Amoroso Const. Co. v. United States*, 981 F.2d 1073, 1075 (9th Cir. 1992); *see also Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 869 (D.C. Cir. 1996) ("[A] silent statute cannot preclude its reasonable interpretation by the agency that administers it.").  Where a statute is silent on the precise question at issue, the statute

is ambiguous.  *See Am. Forest & Paper Ass'n v. FERC*, 550 F.3d 1179, 1181 (D.C. Cir. 2008) (quoting *Tex. Mun. Power Agency*, 89 F.3d at 869) ("In view of its silence on the point at issue, we must hold the statute ambiguous.").  "[T]he question for the court is whether [the regulation is] . . . a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.

Indeed, the court in *Walker Macy* specified that "even if petitions are considered 'filed' immediately upon delivery, USCIS has discretion to decide how best to order those petitions." 243 F. Supp. 3d at 1176.  By the same token, even if registrations are considered "collected" immediately upon submission, USCIS still has discretion to decide how to order those registrations.

### B.  The Final Rule Provides a Reasonable Mechanism for Ordering Simultaneous Submissions.

As explained above, 8 U.S.C. § 1184(g)(3) offers no guidance on how USCIS should prioritize H-1B petitions (or registrations) when the agency receives a deluge of simultaneous or near-simultaneous submissions that far exceed the statute's numerical limitations.  As DHS recognized in the Final Rule, implementing random selection is one reasonable way to order these registrations.  86 Fed. Reg. at 1,677.  But DHS determined that so too is prioritizing registrations based on wage levels.

DHS reached that conclusion after determining that such prioritization is more considerate of what it viewed as the dominant purpose of the H-1B visa program: "help[ing] U.S. employers fill labor shortages in positions requiring highly skilled workers."  *Id.* at 1,698; *see also id.* at 1,697 ("By changing the selection process, for these years of excess demand, from a random lottery selection to a wage-level-based selection process, DHS will implement the statute more faithfully to its dominant legislative purpose, increasing the chance of selection for registrations or petitions seeking to employ beneficiaries at wages that would equal or exceed the level IV or level III prevailing wage for the applicable occupational classification."); *see also id.* at 1,698 ("While the random lottery selection process is a reasonable solution, DHS believes that an allocation generally

21

based on the highest OES prevailing wage level that the proffered wage equals or exceeds better fulfills Congress' stated intent that the H-1B program help U.S. employers fill labor shortages in positions requiring highly skilled workers."). In reaching that conclusion, DHS considered legislative history and, based on that review, concluded at that time that selection by corresponding wage level is more faithful to its interpretation of legislative intent and the purpose of the H-1B program. *See id.* at 1,697 n.84 (quoting H.R. Rep. 101-723(I) (1990), *as reprinted in* 1990 U.S.C.C.A.N. 6710, 6721).[11]

It is entirely reasonable for an agency faced with statutory silence to consult a statute's legislative history to determine how best to exercise its discretion while remaining faithful to the statute's purpose. Indeed, courts applying *Chevron* "must uphold an agency's interpretation if it is 'reasonable and consistent' with the statutory purpose and legislative history." *Nat'l Auto Dealers Ass'n v. FTC*, 864 F. Supp. 2d 65, 78 (D.D.C. 2012) (quoting *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 421 (D.C. Cir. 2000)); *see also Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 44 (D.D.C. 2008). Notably, Plaintiffs do not directly engage with the legislative history underlying the H-1B program. Instead, Plaintiffs disregard legislative history and note that the statute itself does not provide for selection based on wage levels. But that simply reinforces the statute's silence regarding how to choose between simultaneous submissions. *See* Pls.' Mem. at 14. Indeed, Plaintiffs argue that "[n]o amount of policy-talk can overcome a plain statutory command," *id.* (quoting *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021)), but that argument misses the point: there is no "plain statutory command" regarding this issue.

---

[11]  Plaintiffs contend that "the agency's assumption that *highly skilled* and *highly educated* workers necessarily equate to higher salaried workers is unsupported and facially dubious," but Plaintiffs offer zero support for that assertion. *See* Pls.' Mem. at 14. DHS addressed this argument at various points in the Final Rule, *see, e.g.*, 86 Fed. Reg. at 1,708; *id.* at 1,691. Plaintiffs offer no specific evidence to refute the agency's conclusion that salary can be generally "indicative of skill level and relative value of the worker to the United States." *Id.* at 1,708.

For the same reason, Plaintiffs' admonishment that agencies are bound not only by a statute's purpose, but "by the means [Congress] has deemed appropriate[] and prescribed[] for the pursuit of that purpose," is inapposite. *See* Pls.' Mem. at 15 (quoting *Gresham v. Azar*, 950 F.3d 93, 101 (D.C. Cir. 2020)). In *Gresham*, the court found that the Medicare statute had one primary objective (to provide access to medical care) that reflected the "unambiguously expressed intent of Congress," and thus that the agency could not justify its actions by relying on other objectives that were absent from the statute. 950 F.3d at 100-01 (quoting *Chevron*, 467 U.S. at 842-83); *see also, e.g.*, *Colo. River Indian Tribes v. Nat'l Indian Gaming Com'n*, 466 F.3d 134, 139-40 (D.C. Cir. 2006) (holding that it was clear that Congress wanted the agency to achieve the statute's goals "in a particular way," and rejecting an agency's authority to achieve that goal through another means). Here, by contrast, the agency is not trying to articulate new objectives outside of the unambiguously expressed intent of Congress. Rather, as explained above, the agency has discretion to choose among reasonable options, in light of statutory silence. *Chevron*, 467 U.S. at 843. In such a case, it is entirely reasonable for an agency to choose among reasonable courses of action by considering its interpretation of—and prioritization among—the statute's policy aims. *See Gresham*, 940 F.3d at 103-04 (citing *Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999)) (noting that where a statute has multiple objectives that "could point to conflicting courses of action," an agency may "give precedence to one or several objectives over others without acting in an arbitrary and capricious manner").

"Congress left to the discretion of USCIS how to handle simultaneous submissions," *Walker Macy*, 243 F. Supp. 3d at 1176, and DHS determined that prioritizing and selecting applications based on OES wage levels is a reasonable exercise of such discretion in years where the number of H-1B visas sought exceeds the numerical limitations imposed by statute. Finally, as explained further below, DHS reasonably explained its change in position regarding the interpretation of the INA in this context.

23

### III.    DHS RESPONDED SUFFICIENTLY TO THE PUBLIC COMMENTS AND REASONABLY SELECTED THE COURSE OF ACTION REFLECTED IN THE FINAL RULE.

In the course of the rulemaking at issue here, DHS adequately responded to all "significant" comments, that is, those "which, if true, raise points relevant to the agency's decision, and which, if adopted, would require a change in the agency's proposed rule." *City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (citation omitted); *see* 86 Fed. Reg. at 1,679; *see also Am. Great Lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 3d 27, 53 (D.D.C. 2017) (stating that agencies are required to "respond in a reasoned manner to significant comments received," but not required to "respond to every comment, or to analyze every issue or alternative raised by the comments" (citation, quotation marks, and brackets omitted)).  Plaintiffs highlight two sets of comments that, they allege, DHS failed to adequately address.  Pls.' Mem. at 20-23.

Contrary to Plaintiffs' contentions, however, DHS did address the issues raised by those comments with reasoned explanations.  That is all that it was required to do.  While an agency's response to significant public comments must do more than simply "[n]od[ ] to concerns raised by commenters only to dismiss them in a conclusory manner," *Gresham v. Azar*, 950 F.3d at 103, this obligation "is not 'particularly demanding,'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441–42 (D.C. Cir. 2012) (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)).  An agency's response to the comments must simply enable the Court "to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did," but an agency need not "discuss every item of fact or opinion included in the submissions made to it." *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 17 (D.C. Cir. 2015)).

The first category of comments that Plaintiffs argue DHS failed to "rationally discuss" are

the comments pertaining to the change in DHS's interpretation of 8 U.S.C. § 1184, noting that, in January 2019, DHS indicated that prioritizing H-1B applications by wage level would require a legislative change. Pls.' Mem. at 20 (citing 84 Fed. Reg. at 913); *see also* Pls.' Mem. at 12-13. But Plaintiffs dismiss DHS's lengthy discussion of this issue without acknowledging the detailed explanation DHS provided. *Compare* Pls.' Mem. at 20 *with* 86 Fed. Reg. at 1,694-95. In fact, DHS included several paragraphs explaining its current interpretation of the statute and expressly addressed why it did not feel bound by its prior statement. *See* 86 Fed. Reg. at 1,695. Specifically, DHS stated that "the prior statement did not provide further analysis regarding that conclusion and that upon further review and consideration of the issue initially raised in comments … DHS concluded that the statute is silent as to how USCIS must select H-1B petitions, or registrations, to be filed toward the numerical allocations in years of excess demand." *Id.* DHS then explained at length its legal basis for reaching that conclusion. *See id.* at 1,693-98. Such explanation is more than sufficient to demonstrate that this issue was adequately "ventilated" and to show why DHS "reacted . . . as it did." *Carlson*, 938 F.3d at 344; *see Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (maintaining that "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change").

As for the second category of comments that Plaintiffs highlight, Plaintiffs contend that DHS failed to consider the impact of the Final Rule on applicants for H-1B visas at the lower wage levels (and businesses that hire such workers), who may be early-career professionals, and erroneously considered that these positions were "lower-skilled positions." Pls.' Mem. at 20-22. Plaintiffs specifically reference comments submitted by plaintiff Information Technology Industry Council ("ITI"). *See* AR at 1871-78. Plaintiffs acknowledge that DHS responded to these

comments (or similar ones), but characterize DHS's response as "bare bones" and dismissive.[12]

Pls.' Mem. at 21 (citing 86 Fed. Reg. at 1,682). Plaintiffs' characterization is incorrect—in fact,

DHS's response was thorough and reasoned. DHS agreed that, "in years of excess demand,

relatively lower-paid or lower-skilled positions will have a reduced chance of selection." 86 Fed.

Reg. at 1,682. However, DHS reasonably noted that an employer could choose to offer a recent

foreign graduate a higher wage, either to increase the chances of selection or simply because of

market forces. *Id*. Indeed, the possibility that recent graduates could garner higher salaries is an

option raised as a reality by another commenter. *See id.* at 1,680 (describing commenter "knowing

firsthand that new graduates regularly receive job offers at level II wages or above from large

technology companies"). Moreover, as DHS explained later, "a random selection is not optimal,"

*id*. at 1,682, and, "with the current random selection process, even the most talented foreign student

may have less than a 50 percent chance of selection." *Id*. at 1,684. DHS reasoned that, by moving

away from random selection, "[t]his rule will increase the chance of employment at the higher

wage levels and thus may facilitate the selection of the best and brightest students for cap-subject

H-1B status." *Id*. In other words, although wage level I registrations (or petitions, as applicable)

are unlikely to be selected, recent graduates and early career professionals may still be chosen,

because the Rule incentivizes employers to offer higher wages to very talented individuals,

regardless of their career stage. In other words, contrary to Plaintiffs' understanding, Defendants

do "dispute [the conclusion] that the Final Rule will extinguish access to the H-1B program for

early-career professionals." Pls.' Mem. at 24. DHS also disagreed with the assertions of ITI and

---

[12] Elsewhere in their brief, Plaintiffs suggest that the agency "did not address" ITI's specific comment, Pls.' Mem. at 23, but as explained in this section, DHS did address the specific issues raised by that comment in various points throughout the Final Rule.

others (*see* Pls.' Mem. at 23) that the new rule would have a negative impact on the economy, finding that "[f]acilitating the admission of higher-skilled foreign workers, as indicated by their earning of wages that equal or exceed higher prevailing wage levels, would benefit the economy and increase the United States' competitive edge in attracting the 'best and the brightest' in the global labor market."  86 Fed. Reg. at 1,684.

In addition, DHS suggested that recent foreign graduates "can gain the necessary skills and experience to warrant prevailing wage levels II or above" through participation in Optional Practical Training ("OPT"), *id*. at 1,680, a one-year (or longer for STEM graduates) period in which a student is able to work under a student visa classification and which is unaffected by the new rule, and, further, that the "selection order increases the chance of selection" for people "who have earned a master's or higher degree from a U.S. institution of higher education."  *Id*. at 1,682. With regard to rural areas, another issue raised by Plaintiffs (Pls.' Mem. at 21, 24-25), DHS noted that the prevailing wage levels "necessarily take[] into account the area of intended employment when such wage level data is available."  86 Fed. Reg. at 1,686; *see also id.* at 1728-29.  Thus, rural areas will not, as Plaintiffs fear, automatically suffer because they are not able to offer wages as high as those offered in urban centers.  Instead, where possible, the wage levels are tailored to the geographic area—allowing, for example, for Level IV wages that are lower than the Level IV wages required in urban centers.

Finally, DHS also addressed comments criticizing the thirty-day comment period as too short (*see* Pls.' Mem. at 23), explaining why it believed this period was sufficient (in part, because of "the quantity and quality of comments received").  86 Fed. Reg. at 1,709.  Thus, DHS reasonably addressed all the concerns highlighted by Plaintiffs.

27

In any event, to the extent the Final Rule reduces the chance of selection for recent graduates or others who will be paid entry-level wages, DHS reasoned that wage prioritization was more consistent with what it viewed as the primary purpose of the H-1B visa program, "help[ing] U.S. employers fill labor shortages in positions requiring highly skilled workers."  86 Fed. Reg. at 1,698; *see id.* at 1,682 (stating "selection based on the highest wage level that a proffered wage equals or exceeds is more consistent with the primary purpose of the statute").  DHS reasonably concluded that wage prioritization selection is more likely to reach higher skilled workers than a not-"optimal" random selection.  Moreover, "employers that might have petitioned for a cap-subject H-1B worker to fill relatively lower-paid, lower-skilled positions, may be incentivized to hire available and qualified U.S. workers for those positions."  *Id.* at 1,687.

Plaintiffs also contend that DHS did not adequately account for widespread reliance interests on the previous, random-lottery-based system for issuing H-1B visas.  Pls.' Mem. at 23.  Again, Plaintiffs are incorrect.  First, DHS proactively addressed reliance in its notice of proposed rulemaking, concluding that "the importance of prioritizing selection generally based on the highest prevailing wage level that a proffered wage equals or exceeds outweighs any reliance interests of petitioners in a random H-1B cap selection process."  85 Fed. Reg. at 69,244; *see Safari Aviation Inc. v. Garvey*, 300 F.3d 1144, 1152 (9th Cir. 2002) (holding that agency's "failure to examine [plaintiff's] comments before promulgating the final rule is harmless" where, *inter alia*, the issues "were adequately addressed during previous rulemaking proceedings").  Second, in the rule itself, DHS explained that "[t]his rule does not affect current H-1B employees (unless such workers become subject to the H-1B numerical allocations in the limited circumstance that their cap-exempt employment terminates) nor does the rule change the eligibility criteria to qualify for an H-1B visa."  86 Fed. Reg. at 1,688.  Finally, DHS further addressed reliance issues when it

delayed the effective date of the rule so that the new system would most likely not apply until FY 2023.  *See* 86 Fed. Reg. at 8,546.  In that notice, DHS agreed that "providing the regulated public with only 60 days . . . to adapt to new regulatory requirements and modifications of the H-1B registration system before the FY 2022 H-1B cap registration season would cause confusion and very likely would significantly disrupt the orderly administration of the H-1B cap," *id*., and that it was advisable to delay implementation to ensure "the regulated public has enough time to adjust to the new registration selection process."  *Id*. at 8,547.

The Supreme Court has held that, when an agency changes its policy, it must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'"  *Encino Motorcars*, 136 S. Ct. at 2126.  In such circumstances, the agency must give a "reasoned explanation . . . of the Department's change in position."  *Id*.  Here, DHS acknowledged that it was changing its position on how the H-1B cap selection process would operate, 86 Fed. Reg. at 1,677, showed that there were good reasons for the change, *id*., responded to concerns from commenters who had relied on the former system for valuable students and staff that they believed would not be selected under the new system, *see id*. at 1,682-84, and explained how the new policy would address the facts and circumstances underlying the prior policy—the impossibility of rote ordering of simultaneous petitions—in a manner that was better harmonized with the statute, *id*. at 1,677.  DHS amply met its burden to acknowledge the reliance interests and explain why it was nonetheless making the policy change.

In the final pages of their brief, Plaintiffs identify a number of harms that they believe will stem from the Final Rule, many of which echo their arguments regarding the agency's response to public comments.  *See* Pls.' Mem. at 23-26.  Even assuming that Plaintiffs are correct that these harms will flow from the Final Rule, none of these purported harms amount to a colorable legal

argument about the Rule's validity. The question before this Court is not whether the Final Rule is harmless (or even if it is wise), but whether it is arbitrary and capricious or otherwise contrary to law.

To the extent that Plaintiffs intended to argue that the agency failed to adequately respond to public comments about these harms, that argument has no merit. As explained above, DHS meaningfully responded to concerns about its legal authority to promulgate the rule, *see* pages 17-23, *supra*, and about the impact of the Final Rule on applicants at lower wage levels (and businesses that offer such wage levels, such as ITI's members), *see* pages 25-27, *supra*. DHS also responded directly to concerns about the sufficiency of the thirty-day comment period, noting the narrow scope of the rule and "the number of high-quality comments received from the public, including individuals, attorneys, employers, and organizations." *See* 86 Fed. Reg. at 1,709. DHS also considered and responded to comments regarding the impact of the Final Rule on early career professionals, *see* pages 25-27, *supra*, and on medical professionals, *see, e.g.*, 86 Fed. Reg. at 1,682, 1,685-87 (addressing the impact of the Final Rule on foreign medical workers, including physicians and dentists, and including in rural and/or underserved communities).[13]

At bottom, Plaintiffs simply disagree with the policy choices made by DHS. But that is not a basis to overturn those policies. *See N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007) ("While [an agency's] conclusion may be debatable as a policy matter, mere policy disagreement is not a basis for a reviewing court to declare agency action unlawful." (citing *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C. Cir. 2004)));

---

[13] Although Plaintiffs discuss the impact of the Final Rule on the health care industry, Plaintiffs do not seem to assert that DHS failed to respond to comments regarding that issue—likely because DHS responded to such comments at length in the Final Rule.

*see also Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1116 (4th Cir. 2014) ("[T]he APA does not give us license to second-guess an agency's well-reasoned decision simply because a party disagrees with the outcome.").

In sum, DHS articulated a thoughtful and comprehensive rationale for adopting the Final Rule challenged by Plaintiffs, and that methodology is consistent with the discretion provided to DHS under the relevant statutory provisions. DHS considered and responded to significant comments. The Final Rule and the rulemaking record thus demonstrate that the rule is reasonable, and not arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the court should grant Defendants' cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated:  October 11, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Alexandra R. Saslaw*
CAROL FEDERIGHI
Senior Trial Counsel
ALEXANDRA R. SASLAW
LAUREL H. LUM
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 514-4520
Email: alexandra.r.saslaw@usdoj.gov

*Counsel for Defendants*